969 P.2d 10 (1998)
136 Wash.2d 865
Patricia DiBLASI, a single woman; Safeco Insurance Company of America, a stock insurance company, Petitioners,
v.
CITY OF SEATTLE, a municipal corporation, Respondent.
No. 65447-6.
Supreme Court of Washington, En Banc.
Argued March 11, 1998.
Decided December 24, 1998.
Karen Willie, Seattle, for Petitioners.
Mark Sidran, Seattle City Atty, Marcia Nelson, Asst. Seattle City Atty, Seattle, for Respondent.
Ritchie & Strohmeyer, Craig Ritchie, Port Angeles, William Cameron, Kennewick, for Amicui Washington State Association of Municipal Attorneys.
ALEXANDER, J.
We granted review of a decision of the Court of Appeals in which that court reversed a summary judgment in favor of Patricia DiBlasi and dismissed her suit against the City of Seattle for damage to her real property allegedly caused by the runoff of surface water. The principal issue before us is whether a municipality can be held liable for a landslide caused by surface waters that are collected and channeled on a city street and thrust onto the property of another in a manner different from the natural flow. We hold that a municipality may have liability in such circumstances, and, therefore, we reverse the Court of Appeals. We, however, remand to the trial court to resolve the factual dispute about whether the City's street did in fact act to collect, channel and thrust surface waters onto DiBlasi's property in a manner different from the natural flow.
*11 In 1924, a real estate developer platted land in West Seattle and dedicated SW Barton Street (Barton), 38th Avenue SW (38th), SW Bernice Place (Bernice), and SW Fletcher Street (Fletcher) to the City of Seattle for public use as roadways. The dedication carried with it the right of the City to make necessary slopes for cuts or fills in the original grading of the streets. The City owns property south of Bernice and west of 38th, commonly called Fauntleroy Park. Bernice, Barton, and 38th have all been developed as streets. Fletcher has not been developed as a street because it lies at the bottom of a ravine.
DiBlasi's house, which was built in 1975, is on 38th directly across from Fauntleroy Park. The house, which sits near the edge of the ravine, is 20 to 30 feet lower than Barton. Thus, 38th slopes fairly steeply downhill from Barton. A map on the next page illustrates this area.

The City initially opened and paved only the upper 135 feet of 38th and when it did so it did not construct any catch basins, channels, ditches, or artificial drains. In 1975, the developer who built the DiBlasi home graded and graveled an additional portion of 38th, extending the street to the edge of the ravine. The City alleges that the contractor *12 filled a smaller ravine, but the contractor denies having done so.
Sometime after DiBlasi's contractor graded and graveled the southern portion of 38th, the City built a berm on Barton at the point where that street intersects with 38th. The berm was installed in order to stop surface water from running over onto 38th. Prior to April 1991, the City resurfaced Barton and removed the berm. According to Barbara Jayne, a long-time resident of the area, large amounts of rain water ran down 38th from Barton after the berm was removed. A hydrology expert, Dr. K. Malcolm Leytham, who was retained by DiBlasi "in part to review the City of Seattle's activities in the area of 38th Avenue S.W. from a hydrological standpoint," estimated that the removal of the berm doubled the amount of water that ran down 38th. Clerk's Papers (CP) at 257. Barbara Jayne indicated in her declaration that this concerned her because the water "was eating away and putting crevices down the street." CP at 262.
Responding to complaints from citizens about the problem created by the removal of the berm, the City eventually constructed a new berm. This did not, however, prevent water from running down Barton to 38th in times of heavy rain. Surface water runoff from the paved portion of 38th also continued to create gullies on the graveled portion of that street.
In early March 1991, the ground at the foot of 38th "set-down" about three feet. CP at 86. This so-called "tension crack," or "slump," extended 40 feet east from the edge of Fauntleroy Park across the end of 38th and the DiBlasi property. A landslide expert, P. Erik Mikkelsen, inspected the site at this time at DiBlasi's request and concluded that surface water runoff down 38th street had saturated the fill material on the slope and created the slump. He also feared that additional surface water would flow into the newly-opened crack and cause a landslide. Mikkelsen, acting on DiBlasi's behalf, contacted the City about the problem and met at the site on two occasions with Herb Allwine of the Seattle Engineering Department to discuss the situation. The City, however, declined to take any action.
During a rainstorm in early April 1991, water pressure in the tension crack caused the slope to give way, taking out a portion of DiBlasi's property up to the edge of her house. Mikkelsen indicated that if the City had taken action when requested, it could have prevented the slide by inserting horizontal drain pipes to drain the slope, thereby redirecting the surface water. He also opined that the City could have accomplished this work in two days at a cost of $15,000. Mikkelsen concluded that "[w]hat finally triggered the April 4th landslide was, in my opinion, the water concentrated by and flowing off 38th Avenue S.W. into the tension crack." CP at 89.
Leytham indicated that "[b]ecause of the location of 38th Avenue S.W., surface waters have been concentrated, collected and thrust onto adjoining lands in quantities greater than, and different from, the natural regime." CP at 134. But for the presence of the street, according to Leytham, the surface water would have percolated into the ground and not over the sides of the ravine. In explaining the factors that contributed to the slide, he stated:
[I]t is self-evident that the location of 38th Avenue S.W. resulted in storm runoff being discharged into the area of the slump at the foot of 38th Avenue S.W. The volume of water is a function not only of the amount of rainfall but of the contributing surface area of both 38th Avenue S.W. and S.W. Barton Street, and the impermeable nature of the street surfaces.
CP at 895.
DiBlasi brought suit against the City on an array of theories, including a claim that the City failed to maintain its prescriptive easement for surface water flows running down 38th and that it allowed 38th to concentrate, collect and thrust waters onto her property in "quantities greater than, and in a manner different from, the natural regime." CP at 137. DiBlasi also asserted that the City's negligent failure to maintain its street caused the landslide, created a nuisance, and constituted a taking and trespass. The City denied liability and claimed affirmative defenses of contributory negligence, prescriptive *13 easement and contribution. It also alleged that liability should be apportioned to the developer who allegedly filled in the smaller ravine.
DiBlasi and the City each moved for summary judgment. DiBlasi submitted the declarations of Mikkelsen and Leytham in support of her motion. The City relied on its expert, John Peterson, who disagreed with the conclusions reached by DiBlasi's experts. Peterson stated that "[a]ny surface waters which reached the slide area, the side of the slope, or the DiBlasi property by way of the street right-of-way were simply those which naturally flowed therefrom, and there was no artificial collection or concentration of surface waters onto or down the right-of-way." CP at 269. The trial court, apparently relying on the declarations of DiBlasi's experts, entered summary judgment in favor of DiBlasi on all of her claims except for inverse condemnation.
The Court of Appeals reversed and dismissed DiBlasi's suit, concluding that any damage caused by surface waters that would have percolated into the ground, but for the impermeable surface of the roads, cannot, as a matter of law, give rise to municipal liability. DiBlasi v. City of Seattle, 85 Wash.App. 514, 522, 933 P.2d 443, review granted, 133 Wash.2d 1002, 943 P.2d 663 (1997). It also held that the City could not be held liable for failing to maintain a prescriptive easement because the City did not thrust water onto her property, and that DiBlasi could not prevail on her theory that the City failed to maintain the roadway because such a duty only extends to travelers along the roadway. Finally, the Court of Appeals upheld the trial court's dismissal of DiBlasi's inverse condemnation claim, concluding that she failed to establish that the City's actions had caused her injury. DiBlasi's petition for review to this court followed.[1]

I. Standard of Review
We may affirm an order granting summary judgment only if we are satisfied, after considering the facts in the light most favorable to the nonmoving party, that "there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." Barnes v. McLendon, 128 Wash.2d 563, 569, 910 P.2d 469 (1996) (citing In re Estates of Hibbard, 118 Wash.2d 737, 744, 826 P.2d 690 (1992)). All questions of law are reviewed de novo. Mountain Park Homeowners Ass'n v. Tydings, 125 Wash.2d 337, 341, 883 P.2d 1383 (1994) (citing Syrovy v. Alpine Resources, Inc., 122 Wash.2d 544, 548 n. 3, 859 P.2d 51 (1993)).
II. Can a City be Held Liable for Damages Caused by Surface Water That is Collected and Channeled Off of a City Street and Thrust onto the Property of Another?
The City has asserted that the trial court erred in not granting summary judgment in its favor on the basis that a City cannot, as a matter of law, be held liable for damages caused by surface water[2] that is collected on its streets and channeled onto the property of another. The Court of Appeals agreed with this proposition and reversed the summary judgment order the trial court granted to DiBlasi and dismissed her suit against the City. In doing so it cited Wood v. City of Tacoma, 66 Wash. 266, 271, 119 P. 859 (1911), for the principle that municipalities are not liable for injury to property "occasioned by the original grading of streets." DiBlasi, 85 Wash.App. at 518, 933 P.2d 443. The Court of Appeals went on to observe that the rights and liabilities of a municipality as to surface water are identical to those of private landowners, and that because surface water is a "common enemy" the municipality may defend itself against *14 iteven to the consequent injury of others. DiBlasi, 85 Wash.App. at 518, 933 P.2d 443.
The Court of Appeals' assessment of the rule from Wood fails to take into account some additional language from that opinion that is highly relevant here:
There is an exception to this rule of nonliability, which, though not indorsed by some of the courts, and which we do not find has often been applied to the initial grading of streets, we nevertheless believe to be sound in any case. A city may not gather up surface water and discharge it upon land in a concentrated volume ... without liability, whether the water be such as naturally would have flowed onto the land or not.
Wood, 66 Wash. at 272-73, 119 P. 859.
The Court of Appeals did, however, recognize a later case where we stated that a municipality can be liable if "in the course of an authorized construction, it collects surface water by an artificial channel or in large quantities and pours it, in a body, upon the land of a private person, to his injury." Wilber Dev. Corp. v. Les Rowland Constr., Inc., 83 Wash.2d 871, 874, 523 P.2d 186 (1974).
We went on to say:
[W]hile municipal authorities may pave and grade streets and are not ordinarily liable for an increase in surface water naturally falling on the land of a private owner where the work is properly done, they are not permitted to concentrate and gather such water into artificial drains or channels and throw it on the land of an individual owner in such manner and volume as to cause substantial injury to such land and without making adequate provision for its proper outflow, unless compensation is made.
Wilber, 83 Wash.2d at 874-75, 523 P.2d 186 (emphasis added) (citing 18 EUGENE McQUILLIN, MUNICIPAL CORPORATIONS § 53.144, at 538 (3d ed. rev.1963)). A rule as arguably inconsistent as the one in Wilber requires, to be sure, some close reading in its interpretation. Suffice it to say, however, that in reading this language from Wilber, in conjunction with what we wrote in Wood, one cannot substitute the words "never liable" for "not ordinarily liable." The Court of Appeals, though, concluded that the City could not have liability for the slide because the mere improvement of a public street can never constitute artificial collection, concentration, or channeling of water under the common enemy doctrine of water law. According to that court, the declarations of DiBlasi's expert failed to establish anything more than a normal increase in the flow of water attributable to location and construction of nonpermeable roadways.
In reaching its determination, the Court of Appeals relied to an extent on the common enemy doctrine. That rule provides that surface water is "an outlaw and a common enemy against which anyone may defend himself, even though by so doing injury may result to others." Cass v. Dicks, 14 Wash. 75, 78, 44 P. 113 (1896). It concluded that the City could not be liable for water runoff caused by simply paving the ground's surface, and that DiBlasi could not complain about the street's location because it was located where the grantor (her predecessor-in-interest) had dedicated it. The Court of Appeals likewise held that removal of the berm on Barton street did not give rise to "liability for artificial concentration and discharge" because the City had no duty to construct the berm in the first place, and there was no evidence as to when the City removed the berm.[3]DiBlasi, 85 Wash.App. at 523, 933 P.2d 443.
DiBlasi contends that the Court of Appeals misapplied the common enemy doctrine in the instant case. She asserts that this rule only shields landowners from liability when they take a positive action to protect their property from surface water damage. She contends that because the City took no affirmative steps to protect its streets from the surface water, the rule does not apply. By failing to recognize this distinction, she concludes, the court turned the common enemy *15 "shield" into a "sword" that the City could use to both avoid its obligations to remedy a hazardous condition and to impose the duty to repair the street on a private citizen.
DiBlasi also contends that the common enemy doctrine only protects a landowner who acts reasonably to defend against surface waters. We have written as much before. See Morris v. McNicol, 83 Wash.2d 491, 495, 519 P.2d 7 (1974) ("[T]his doctrine applies only if the upland landowner's use is reasonable." (Citation omitted)). She argues that the City acted unreasonably by refusing to do anything about the problem once the fissure opened up "even though ... lives and property were threatened and even though the City could have remedied the problem in a short period of time and for a small amount of money." Pet. for Review at 12.
DiBlasi's argument regarding the common enemy doctrine is persuasive. However, as this court made clear in Wood, the rule limiting municipal liability for storm water runoff is not based solely on the common enemy doctrine. Rather, it is also based on the principle that a city does not have to pay landowners for consequential damages to their property from the original grading of streets and alleys as long as the city does not gather up surface water and discharge it upon adjoining land in a concentrated volume.
In support of her assertion that the City can have liability here, DiBlasi relies on a decision from Division Three of the Court of Appeals wherein that court held that Douglas County had liability for damages caused by water runoff from a county road which acted as a channel to collect and divert water from its natural course. See Burton v. Douglas County, 14 Wash.App. 151, 154-55, 539 P.2d 97, review denied, 86 Wash.2d 1007 (1975). The road at issue in Burton was in a watershed and "acted as an artificial drain because the water draining from the east to the west, in the absence of the crown in the road, would have continued to run across the road instead of being channeled by it." Burton, 14 Wash.App. at 154, 539 P.2d 97. Liability resulted for damages caused to an adjacent property owner's home because "Douglas County's road acted as a channel to collect and divert water from its natural course and ultimately discharge surface water upon Burton's property to his injury." Burton, 14 Wash.App. at 155, 539 P.2d 97 (footnote omitted).
The Court of Appeals in this case acknowledged that Burton supports DiBlasi's claim, but declined to follow the decision because it could not "meaningfully reconcile its holding with Wood." DiBlasi, 85 Wash.App. at 520, 933 P.2d 443. It stated that under its reading of Wood, a municipality does not incur liability for constructing a road upon a dedicated street plat, even though it changes the surface and increases the surface water runoff onto adjacent property. Because Burton "relied upon the existence and original grading of the road, rather than the gathering of water into an artificial drain or channel," the court concluded that "it misstates the law." DiBlasi, 85 Wash.App. at 520, 933 P.2d 443.
DiBlasi also relies on a decision from Division Two of the Court of Appeals wherein that court favorably cited Burton in finding a constitutional taking where Pierce County's construction of both a road and a drainage culvert "caused the collection of surface water from twelve acres of land and artificially channeled it down the slope, through the culvert, and onto the [plaintiffs'] property." Hoover v. Pierce County, 79 Wash.App. 427, 432, 903 P.2d 464 (1995), review denied, 129 Wash.2d 1007, 917 P.2d 129 (1996).[4] However, because the initial taking (i.e., damage to the plaintiffs' property) predated the plaintiffs' purchase of the impacted property, either when the road was constructed or when the culvert was subsequently added, the court found that the County escaped liability because "a new taking cause of action requires additional governmental action" and the County had not undertaken any new action since it installed the roadway culvert. Hoover, 79 Wash.App. at 436, 903 P.2d 464.
DiBlasi argues that the similarities between the instant case and Burton and Hoover warrant a reversal of Division One's decision. As in Burton and Hoover, experts here *16 testified that a city street diverted surface water from its natural flow and acted to channel it onto DiBlasi's property to her injury. Cf. CP at 134; Hoover, 79 Wash. App. at 429, 903 P.2d 464; Burton, 14 Wash. App. at 155, 539 P.2d 97. Therefore, according to DiBlasi, the City should be held liable.
The City contends, on the other hand, that Division One's decision in the instant case was correct and consistent with Wood and the cases that followed it. The City asserts that the Burton case is "an aberration" that is inconsistent with Washington law. Answer of Resp't at 14. It argues that Hoover is distinguishable from the present case because both the road and culvert in that case acted to artificially collect and divert surface waters that were outside the natural watershed. The City's argument does not acknowledge that the Hoover court found that it was the concentration and channeling of water by the street, at least in part, that gave rise to a constitutional taking.
The City relies on Gaines v. Pierce County, 66 Wash.App. 715, 834 P.2d 631 (1992), review denied, 120 Wash.2d 1021, 844 P.2d 1017 (1993), arguing that Division Two of the Court of Appeals held "that drainage from increased surface water flow from the construction of impervious surfaces including the widening of a highway was not compensible [sic]." Answer of Resp't at 10. This is a misstatement of the holding. Moreover, this case is not directly on point. The plaintiffs in Gaines had sued for flooding damage to their property that they alleged was caused by water artificially channeled in ditches constructed along State Route 161, as opposed to the road itself, among other causes. However, the court noted that the plaintiffs' "property lies at the low point of the drainage basin; all surface water in the basin ultimately flows to it; and ... neighbors, by engaging in extensive diking and drainage on their properties, caused increased surface water to be cast toward the [plaintiffs]." Gaines, 66 Wash.App. at 724, 834 P.2d 631. Accordingly, the plaintiffs were not even able to meet the threshold requirement of proving that but for the road construction their property would not have been damaged. Thus, the question of whether such damage would be compensable was not reached. Gaines simply does not support the City's position.
Although this court has held that municipalities are not ordinarily liable for damages that result from surface water which runs off a street, we have never adopted the rule that municipalities cannot be liable, as a matter of law, when such damages are caused by a street that acts to channel, collect and thrust water onto an adjoining landowners property. Were we to adopt such a holding, municipalities would be liable only for damages caused by culverts, gutters and grates that act as artificial channels to thrust water onto another's property. A municipality would, therefore, be able to avoid all liability by building a road without devices to control the flow of surface water, regardless of the consequences. Public policy clearly does not support the adoption of such a rule, and we see no reason to now limit our prior holdings in Wood and Wilber.
The concurrence indicates that it is "troubled by the chronology of key events," Concurrence at 20, and proceeds to use it to discuss a "coming to the nuisance" defense for the City by noting that DiBlasi's house was built seven years after 38th was constructed. By raising this issue the concurrence necessarily concedes that the condition of 38th did constitute a nuisancea concession quite inconsistent with the concurrence's overall position. Significantly, though, this is not a defense that the City asserted, and we will not raise this unbriefed argument for them sua sponte.
We favor the reasoning adopted by Division Three in Burton and Division Two in Hoover. In our judgment, there is not a valid distinction between a culvert or gutter that acts to collect, concentrate and channel surface water in a manner different from the natural flow, and a street which causes damage to an adjoining property owner by acting in the same manner. Liability should result in each case.
Having concluded that a municipality may be liable for damages to an adjoining landowner's property caused by a street which acts to collect, channel and thrust water in a manner different from the natural flow, the next question is whether 38th acted *17 in such a way as to cause damage to the DiBlasi property.
It is apparent from the record, given the contrasting opinions of DiBlasi's experts and the City's, that there is a factual dispute as to whether 38th acted to collect, channel and thrust water in a manner different from the natural flow, and, therefore, summary judgment was improper. Accordingly we remand the case for trial on that issue.[5] Because DiBlasi's claims of prescriptive easement and inverse condemnation depend on whether 38th channeled water onto her property, those claims are not properly before us at this time.

III. Does the City Owe a Duty to Adjoining Landowners to Maintain its Streets?
DiBlasi contends that the City's duty to properly maintain its streets should run to adjoining landowners as well as the traveling public. She asserts that the City breached this duty when it was put on notice that 38th had a defect (i.e., the tension crack) but did nothing to remedy the problem. According to DiBlasi, the City's failure to repair its street caused the slide which damaged her property.
Municipalities have a duty to use reasonable care to keep streets and roads safe for travel. See Boeing Co. v. State, 89 Wash.2d 443, 446, 572 P.2d 8 (1978) (citing Provins v. Bevis, 70 Wash.2d 131, 422 P.2d 505 (1967)). Municipalities also have a duty to use reasonable care in building and maintaining roadways so that fill dirt does not slide down and damage adjacent property. See Peterson v. King County, 41 Wash.2d 907, 912, 252 P.2d 797 (1953); Kuhr v. City of Seattle, 15 Wash.2d 501, 503, 131 P.2d 168 (1942).
In the unpublished portion of its opinion, the Court of Appeals declined to extend a municipality's duty to maintain city streets to adjoining landowners. It noted that the Peterson case, cited by DiBlasi, includes language which imposes a duty on a "`county to use every reasonable means to protect adjoining landowners'" from damage which may result from the building of a road. DiBlasi v. City of Seattle, No. 36212-7-I, slip op. at 11 (Wash.Ct.App. Mar. 31, 1997) (quoting Peterson, 41 Wash.2d at 912, 252 P.2d 797). However, the court distinguished Peterson and another case, Kuhr, on the basis that they were encroachment cases that each involved land that slid from the defendant's parcel onto adjoining property owned by the plaintiff. In contrast, the court noted that in the instant case, surface waters caused DiBlasi's land to slump and slide away from, not onto, her property. The Court of Appeals also held that the duty to remedy a known street defect is limited to keeping the streets safe for travel. DiBlasi, slip op. at 12 (citing 19 EUGENE McQUILLIN, MUNICIPAL CORPORATIONS § 54.13 (3d rev. ed.1993)). Accordingly, because DiBlasi was not a member of the traveling public at the time of the injury, the City did not owe her a duty to keep its street free from defects.
DiBlasi contends first that this court should not recognize the Court of Appeals' distinction between a City's negligence in building or maintaining a street that causes land to slide onto the property of another and that same negligence that causes a slide which takes land away from that person's property. Either way, according to DiBlasi, the municipality owes a duty to adjoining landowners to exercise reasonable care to maintain its streets so as not to damage their property.
DiBlasi argues secondly that there is no reason to distinguish between the traveling public and an adjoining property owner. Under the holding of the Court of Appeals, DiBlasi argues that she could recover if she had been driving on 38th when it gave way, but she could not recover if she had made it safely home. She asks this court to adopt a rule whereby a municipality owes a duty to *18 any member of the public for damages caused by street defects.
As the City points out, DiBlasi's contention seems to be little more than an attempt to ask the court to replace the rule of limited liability to maintain and repair streets with a broad tort duty to exercise reasonable care toward the general public. She does not discuss how the public duty doctrine would affect the adoption of such a new duty, nor does she discuss how it would affect long-established water law principles such as the common enemy doctrine. Furthermore, the distinction between the duty owed to the traveling public versus the adjoining landowner is logical considering that streets are constructed to benefit those who use them, not those who simply live alongside them (although it can be assumed, of course, that adjoining property owners use the streets to come and go from their homes).
The City may have breached its duty to keep 38th safe for travel if the condition of the road had prevented DiBlasi from using it to travel to her home. However, DiBlasi's argument for a new tort duty under the circumstances of this case risks opening the door to potentially unlimited liability. A request for such a major change in the law is better addressed to the Legislature.
Based on the record and briefs before us, we are not convinced, at this time, that the duty to maintain a street should run to the benefit of adjoining landowners as well as the traveling public. Therefore, the City cannot be liable for any breach of its duty to maintain its street because that duty does not extend to DiBlasi as an adjoining landowner.

IV. Conclusion
We reverse the Court of Appeals' decision reversing summary judgment in favor of DiBlasi and granting summary judgment to the City. For reasons stated above, we believe that the Court of Appeals erred in concluding that a city cannot be liable for damages caused by a street that acts to channel, collect and thrust water in a manner different from the natural flow onto another's property. Consequently, we remand to the trial court for trial on the issue of whether 38th did, in fact, act to channel, collect and thrust water in a manner different from the natural flow onto DiBlasi's property. We, however, affirm the Court of Appeals' holding to the extent it held that a city's duty to maintain a street does not extend to the benefit of adjoining property owners. Reversed and remanded.
DURHAM, C.J., and DOLLIVER, SMITH, GUY, JOHNSON, MADSEN and SANDERS, JJ., concur.
TALMADGE, J., concurring.
I concur with the majority's determination the DiBlasis[1] had no cause of action against the City of Seattle (the City) for negligence. I write separately to emphasize that the majority opinion does not change Washington's long-standing surface water law.
The majority says, "We favor the reasoning adopted by Division Three in Burton [v. Douglas County, 14 Wash.App. 151, 539 P.2d 97 (1975)] and Division Two in Hoover [v. Pierce County, 79 Wash.App. 427, 432, 903 P.2d 464 (1995), review denied, 129 Wash.2d 1007, 917 P.2d 129 (1996) ]." Majority op. at 16. Burton held: "Ordinarily, a municipal corporation is not liable for consequential damages caused by the increased flow of surface water resulting from the initial grading and improvement of its streets." Burton, 14 Wash.App. at 154, 539 P.2d 97. Hoover held: "In cases of water damage caused by street drainage, a municipality is not liable for consequential damages caused by the increased flow of surface water resulting from the presence of streets." Hoover, 79 Wash. App. at 432, 903 P.2d 464. Both cases relied on Wilber Dev. Corp. v. Les Rowland Constr., Inc., 83 Wash.2d 871, 874-75 523 P.2d 186 (1974), where we said:
A municipality ordinarily is not liable for consequential damages occurring when it increases the flow of surface water onto an owner's property if the damages arise wholly from changes in the character of *19 the surface produced by the opening of streets, building of houses, and the like, in the ordinary and regular course of the expansion of the municipality. On the other hand, it is liable if, in the course of an authorized construction, it collects surface water by an artificial channel or in large quantities and pours it, in a body, upon the land of a private person, to his injury. Under this rule, while municipal authorities may pave and grade streets and are not ordinarily liable for an increase in surface water naturally falling on the land of a private owner where the work is properly done, they are not permitted to concentrate and gather such water into artificial drains or channels and throw it on the land of an individual owner in such manner and volume as to cause substantial injury to such land and without making adequate provision for its proper outflow, unless compensation is made.... At the same time, it is the rule that the flow of surface water along natural drains may be hastened or incidentally increased by artificial means, so long as the water is not ultimately diverted from its natural flow onto the property of another.
The parties have not argued for a change in the law, and the majority does not suggest or discuss a change in the law. The principles stated in Wilber remain the law of Washington. Our law on this subject comports with the law in other jurisdictions: the general rule in municipal law has always been "a municipality is not liable to a property owner for the increased flow of surface water over or onto his or her property, arising wholly from changes in the character of the surface produced by the opening of streets." 18A EUGENE McQUILLIN, MUNICIPAL CORPORATIONS § 53.141 n.2 (3d rev. ed.1993).
The general rule in McQUILLIN and in cases like Wilber is understandable, particularly in climates like that of western Washington. In wet climates, impervious surfaces such as roads will cause water to flow differently than water would naturally flow without such impervious surfaces. In the absence of the general rule, a government constructing roads would be an absolute insurer of the consequences of water runoff from road impervious surfaces onto the land of adjoining landowners, deterring the construction of necessary transportation facilities. Such problems would be exacerbated where the roads were constructed on steep surfaces such as those present in this case. Any expansion of governmental liability in this area should not occur without involvement from the Washington Legislature.
Moreover, any change to the law would have potentially calamitous results. The DiBlasi home was located at the end of a street on a partly paved, partly gravel road that was steeply inclined. As might be expected in the wet climate of western Washington, or any other climate, water will run downhill. And it will run downhill somewhat faster on a paved surface like a street than it would in a natural flow on an unimproved piece of property. If we were to make the developers of impervious surfaces liable to adjoining landowners for surface water runoff under a new rule, there would be potentially untold monetary implications for those developers. Unless we are willing to make developers as well as municipal and state government the insurers of all consequences of water runoff from road construction, an action that has untold financial implications for Washington's transportation system, we should adhere to the traditional rule of surface water liability: property owners are not liable to adjoining property owners for the runoff on roads occasioned only by their grading and paving.
The ultimate fact question in this case, then, is not whether the paving of 38th SW increased the flow onto the DiBlasi property by artificial means, but whether the road diverted rainfall runoff from its natural flow. In order to establish a cause of action, the DiBlasis must demonstrate that the harm to their property was occasioned by more than the fact the street surface was impervious and water ran down its gutters. Liability follows only where the landowner or governmental body takes actions that collect and discharge diffuse surface waters in a manner or in quantities appreciably different from the natural flow of such waters, as in Burton, where the crown in a road collected water that in the natural state would not have been *20 discharged onto the plaintiff's property. Likewise, where a town constructed a ditch that caused the water to move more swiftly than it otherwise would have done by its natural flow, liability followed. Wilber, 83 Wash.2d at 876, 523 P.2d 186. See also Whiteside v. Benton County, 114 Wash. 463, 467, 195 P. 519 (1921) (digging of artificial ditch). If the municipality transferred surface water by a culvert into a ravine, liability might also follow as well. Colella v. King County, 72 Wash.2d 386, 394, 433 P.2d 154 (1967).
Despite my agreement with the majority as to the result here, I am troubled by the chronology of key events in the construction of 38th SW and the runoff that caused the slide at the DiBlasis' property. The road at issue, 38th SW in West Seattle, was graded in 1968 and the top 135 feet of it were then paved.[2] In 1975, the builder of the DiBlasi house obtained a City permit to grade and gravel the continuation of 38th SW down to a lot at the edge of a ravine in order to construct a house there. The permit the builder obtained shows a requirement for a drainage facility near the bottom of the extension of 38th SW, and the permit application states the builder would provide drainage as required. Clerk's Papers at 701, 702. Thus, the developer of the subject lot was aware in 1975 of the necessity for drainage, obviously taking into account water runoff flowing downhill along 38th SW onto the property.
The DiBlasis bought their house in 1988, twenty years after 38th SW was paved. The landslide did not occur until three years later in 1991, twenty-three years after 38th SW was paved. Clerk's Papers at 2-3. If there were actionable error in the City's paving of 38th SW in 1968, why did it not appear until April 1991? The answer is the month of April 1991 brought about an extraordinary amount of rainfall. Under ER 201, we can take judicial notice that during April 1991 rainstorm activity in the Puget Sound region was unprecedented. A record was set for the most rainfall for any 24-hour period in the month of April in 1991. In Seattle, the first five days of April saw more rainfall than is customary for the entire month of April. Numerous mudslides occurred throughout King County. Charles E. Brown, A Month's Rain in Only 24 Hours After 5 Days, It's Already the Wettest April, SEATTLE TIMES, Apr. 5, 1991, at A1.
Thus, if the events in this case had occurred in 2068, one hundred years after the paving of 38th SW, and the DiBlasi house remained standing in 2068 without ever once having suffered water damage, and the greatest rainfall in Seattle history then occurred causing a mudslide, the future owners of the DiBlasi house would have a cause of action against the City simply because water ran down the road.[3] A rule of law that allows such a result cannot be right.
*21 There is an additional question here not fully considered by the parties. We just recently said, "Plaintiffs who purchase or improve property, after the establishment of a local nuisance activity, have `come to the nuisance.' While this fact did not absolutely bar the plaintiff's nuisance action, it was one factor to be considered in whether to grant the plaintiff relief. RESTATEMENT (SECOND) OF TORTS § 840D (1977)." Buchanan v. Simplot Feeders, Ltd. Partnership, 134 Wash.2d 673, 678, 952 P.2d 610 (1998). "Coming to the nuisance" is analogous to assumption of the risk (now subsumed under contributory fault, RCW 4.22.015) and it clearly applies in the present case. Although neither concept is necessarily dispositive, both militate strongly against liability here.
Water had been running down 38th SW for twenty years before the DiBlasis bought their house. The house was built in 1975 directly in the path of the "thrusting and channeling" Safeco now complains of. Safeco was certainly aware water runs downhill and was certainly on inquiry notice of this "thrusting and channeling" when it assumed the underwriting risk and insured the DiBlasis' house. Then an unprecedented deluge occurred in April 1991, causing the mudslide. Insurance exists precisely to pay for such extraordinary events. Safeco took the underwriting risk of insuring a home built on fill, at the edge of a ravine, at the bottom of a street that water had been running down for twenty years. The people of Seattle should not have to reimburse Safeco for this casualty loss. Insurance companies must do more than collect premiums.
NOTES
[1] Even assuming that the concurrence is correct, and Safeco, not DiBlasi, is the real party in interest in this case, Safeco is not any less entitled to recover for its loss than is DiBlasi. See Concurrence at 18 n. 1. Consequently, the discussion by the concurrence regarding the identity of the real party in interest in this case is as irrelevant as would be a discussion of whether the City was insured against potential liability.
[2] Surface waters are defined as "waters produced by rain, melting snow, or springs." King County v. Boeing Co., 62 Wash.2d 545, 550, 384 P.2d 122 (1963) (citing Alexander v. Muenscher, 7 Wash.2d 557, 110 P.2d 625 (1941)).
[3] By focusing on the berm, the Court of Appeals missed the point that Barton concentrated and channeled water down 38th that would otherwise have gone down the hill in a diffuse manner. Leytham testified that the berm did not prevent water from flowing down Barton to 38th during storms and he calculated the increase in the runoff attributable to Barton street water.
[4] The court below made only passing reference to this case in its opinion.
[5] Unlike the concurrence we are not inclined to put ourselves in the shoes of a jury and purport to resolve a factual dispute. The weather report that the concurrence discusses is not dispositive. See Concurrence at 20. Even assuming that the damage to the DiBlasi home occurred after one of history's great rainstorms, a factual dispute would remain as to whether 38th acted to collect, channel and thrust water in a manner different from the natural flow.
[1] The DiBlasis are not the real parties in interest in this case. Ms. DiBlasi denied having any claims. Clerk's Papers at 275. Safeco appears to be a subrogee, although it did not so identify itself in the complaint.
[2] There was considerable discussion at oral argument about a berm. That berm was built at the top of 38th SW along the side of the intersecting street, SW Barton, and prevented water from flowing down 38th SW from SW Barton. Ms. DiBlasi was unable to say when the berm was built or when the berm was removed. Clerk's Papers at 279. Safeco's expert, Dr. Leytham, did not know when the berm was present or absent. Clerk's Papers at 826-27. Safeco's attorney, Ms. Willie, said Safeco was relying on Barbara Jayne's memory of the berm's history. Clerk's Papers at 827. Ms. Jayne had lived on SW Barton since 1977. All she was able to say about the berm is the following:

Prior to the landslide at the end of 38th Avenue S.W. in April of 1991, the City of Seattle resurfaced Southwest Barton Street. Prior to the resurfacing, there was a small asphalt bump or berm across the top end of 38th Avenue S.W. preventing flows from SW [Barton] Street from flowing down 38th Avenue S.W. The city crews took the bump or berm out and large quantities of water began to runoff and down 38th Avenue S.W.
Clerk's Papers at 265. Ms. Jayne's account is devoid of information about when these events occurred. "Prior to the landslide" could mean anytime after she moved into her house in 1977.
The trial judge used information about the berm only to support her conclusion the City was negligent in not controlling the water on 38th SW. The trial court did not base its decision on when the berm was taken out. Report of Proceedings (Sept. 16, 1994) at 77. Because the majority opinion rejects a negligence cause of action, the trial court's use of the berm information to support its finding of negligence is not relevant.
No one can say when the berm was present or absent, much less that but for the removal of the berm, the landslide would not have occurred. In summary, the presence or absence of the berm is of no consequence in this case.
[3] A statute of repose provides protection for the builders and designers of 38th SW, but not for the owner of the road, the City of Seattle. See RCW 4.16.300-.310.