983 P.2d 643 (1999)
139 Wash.2d 1
Leonard and Jeanne HALVERSON, husband and wife, et al., Respondents,
v.
SKAGIT COUNTY, Appellant,
and
State of Washington, Respondents.
No. 66171-5.
Supreme Court of Washington, En Banc.
Argued May 27, 1999.
Decided September 9, 1999.
As Amended September 10, 1999.
Reconsideration Denied November 9, 1999.
*645 Twede & Svaren, David Svaren, Burlington, Lane, Powell, Spears & Lubersky, Eugene Knapp, Mount Vernon, for Amicus Curiae on Behalf of Diking District # 12.
Keller, Rohrback, William Smart, David Major, Mark Griffin, Leonard Barson, Seattle, Charles Wiggins, Bainbridge Island, Hon. Thomas L. Verge, Skagit County Pros., John Moffat, Deputy Skagit County Pros., Mount Vernon, for Appellant.
David Reeve, Bellevue, Steve Berman, Carl Hagens, Anthony Shapiro, Seattle, Christine Gregoire, Atty. Gen., Glen Anderson, Asst. Atty. Gen., Olympia, for Respondent.
*644 IRELAND, J.
This is a direct appeal from a judgment on a jury verdict in an inverse condemnation action. Over 100 residents of the Nookachamps area of Skagit County, Washington, suffered flooding in November 1990. Claiming that the County took their lands without just compensation contrary to the eminent domain provisions of the Washington State Constitution,[1] Plaintiffs brought suit against Skagit County.[2]
We hold Plaintiffs failed to plead a viable theory for imposing liability on the County for the levee-induced flooding because the County did not own the levees or property on which they were built. Furthermore, we hold that the common enemy doctrine provides a viable defense against any such liability.[3] We reverse the verdict, remand for dismissal, and order that the trial court's writ of mandamus be vacated.

BACKGROUND
Before the Skagit River empties into Skagit Bay on the Puget Sound, it flows through 90,000 acres of property lying in a floodplain. The Skagit River delta floodplain is approximately 11 miles across an east-west axis, and 19 miles along a north-south axis. The Nookachamps area, located upstream from the City of Mount Vernon and across the river from the City of Burlington, lies in the Skagit floodplain and has historically been subject *646 to flooding.[4] Pls.' Responsive Br. on Appeal and Br. in Supp. of Cross-Appeal at 8 (hereinafter Pls.' Responsive Br.). The Skagit River has reached flood stage 41 times between 1900 and 1991, an average of once every 2.2 years.[5] Prior to 1990, severe floods in the region were recorded in 1815, 1856, 1897, 1909, 1917, 1921, 1949, 1951, 1975, 1979, 1980, and 1982.[6]
To combat the flooding, landowners along the Skagit River began building dikes as early as 1863. In 1895, the Legislature passed legislation allowing landowners to organize and create public diking districts. Laws of 1895, ch. 117 (codified at RCW 85.05). These diking districts are independent of any other governmental authority. They have the power of eminent domain, RCW 85.05.070, the power to assess taxes against district properties proportionate to the benefits the properties receive from the creation of the dikes, RCW 85.05.075, and the power to issue bonds to fund construction of the dikes. RCW 85.05.078. By 1990, 16 diking districts had been created to maintain approximately 56 miles of levees and 39 miles of sea dikes in the Skagit River delta.
A description of the location of the Nookachamps area is helpful to understand Plaintiffs' claims. A Burlington Northern Railroad bridge crosses the Skagit River near Mount Vernon. Diking Districts No. 12 and No. 17 maintain levees upstream from the bridge. These two districts exist because local property owners organized, taxed themselves, formed the districts, and built dikes to protect their lands. Diking District No. 12 owns the dikes on the north side of the river, and Diking District No. 17 owns dikes on the south side. Diking District No. 12's levees are located between 50 and 1,000 feet from the Skagit River's banks. The river waters do not come into contact with the levees until the waters leave the banks of the river channel.[7]
The Nookachamps area lies on the south banks of the river, upstream from both the railroad bridge and Diking District No. 17, and across the river from dikes owned by Diking District No. 12. Landowners of the Nookachamps area have never utilized the available statutory process for creating a diking district in their own area. As a result, the portion of the south side of the Skagit River along the Nookachamps area is unprotected from floodwaters. The downstream railroad bridge, the downstream levees, and the levees across the river from the Nookachamps area form a constriction during high floodwaters. The County does not contest that this constriction causes floodwaters to back upstream and flow into the low-lying Nookachamps area.[8]
In November 1990, the Skagit River flooded twice, causing damage to various homeowners living on this historic floodplain.[9] In response, 118 plaintiffs brought this inverse condemnation action against Skagit County and Diking Districts Nos. 12 and 17.[10] The districts were voluntarily dismissed from the action, leaving the County as the sole defendant.[11] Nonetheless, Plaintiffs pursued their action against the County, alleging the County acted in concert with the diking districts in the maintenance, improvement, and operation of the diking system. The County's actions allegedly caused an increase in the amount of flooding experienced on Plaintiffs' lands. Plaintiffs claimed this levee-induced flooding constituted an inverse condemnation  that is, a taking without payment of just compensation in violation of article I, section 16 (amendment 9) of the Washington State Constitution. Plaintiffs did not assert a federal takings claim.
In addition to disputing Plaintiffs' theory of liability, the County brought third-party *647 contribution and indemnity claims against the State of Washington.
At trial, Plaintiffs' case was based solely on the theory that their properties were flooded more severely than they would have been had there been no levees along the Skagit River. Specifically, Plaintiffs state that "this case is not about the damage, if any, that plaintiffs would have suffered by natural flooding absent the levees. It is about the incrementally increased levee-induced flooding of between 1½ feet to 4 feet caused by the levee system ...." Pls.' Responsive Br. at 4 (emphasis added). The County first argued it was not liable for the construction and operation of the levees owned by independent diking districts. The County argued that if it was responsible for the levees, despite its lack of ownership, then it was immune from liability because (1) it had obtained a prescriptive easement to cause such flooding; (2) it had the right to cause such flooding under the common enemy doctrine; and (3) it was immune from liability under RCW 86.12.037.[12]
The trial judge excluded the County's immunity defense and its prescriptive easement and common enemy jury instructions, and instructed the jury on joint and several liability as to a tort theory of "acting in concert." The jury found for Plaintiffs and awarded over $1.62 million in damages. Skagit County was found 69 percent liable while the State of Washington was found liable for 31 percent. The trial court then awarded over $1.3 million in prejudgment interest, $2.8 million in attorneys' fees, and $400,000 in expenses, bringing the total judgment against Skagit County and the State of Washington to $6.3 million. In addition, the trial court issued a writ of mandamus, compelling the County to comply with the Shoreline Management Act of 1971, chapter 90.58 RCW, the State Environmental Policy Act of 1971, chapter 43.21C RCW, and numerous county ordinances.

ANALYSIS
First Issue: Is Skagit County solely or jointly and severally liable for damages caused by levees owned by independent dike districts?
Plaintiffs claim the County is either solely or jointly and severally liable for levee induced flooding. The gravamen of Plaintiffs' claim against the County, as set forth in jury instruction 16, is that
Skagit County, either alone or in concert with others, interfered with each plaintiff's use and enjoyment of their personal or real property by diverting overbank floodwater onto each plaintiff's property during significant flood events.
Clerk's Papers (CP) at 1,850. In contrast, the County claims the diking districts are statutorily independent entities which built, and are responsible for maintaining, the dikes that allegedly caused Plaintiffs' flooding. The County claims it cannot be held liable for the levee-induced flooding because the County did not build the dikes or own the property on which they were built. The County is correct. Plaintiffs' theory of liability against the County is legally insufficient and contrary to established inverse condemnation law recently discussed in Phillips v. King County, 136 Wash.2d 946, 968 P.2d 871 (1998).
In Phillips, landowners sued the county and a private developer when drainage water from the development had been channeled across county property and onto the plaintiffs' land. The Court of Appeals found the county potentially liable because it had permitted and approved the development's drainage system, and because the county assumed ownership and maintenance of the drainage system once the development was completed. See Phillips, 136 Wash.2d at 959-60, 968 P.2d 871 (discussing the appellate court's decision). This court disagreed *648 with the Court of Appeals, and the analysis is informative:
The question of when legal liability attaches to one's acts is a policy question, and legal liability is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy, and precedent. Rains [v. Department of Fisheries ], 89 Wash.2d 740,] 743-44[, 575 P.2d 1057 (1978) ]. A governmental entity does not become a surety for every governmental enterprise involving an element of risk. Bodin v. City of Stanwood, 130 Wash.2d 726, 740, 927 P.2d 240 (1996).
Phillips, 136 Wash.2d at 965, 968 P.2d 871. Thus, Phillips held the mere approval of a private developer's drainage plan did not give rise to a cause of action for inverse condemnation. Id.
Phillips also addressed the fact that the county assumed ownership of the development's drainage system upon completion of the development. This court held the ownership of the drainage facilities fails to create liability when the alleged taking is attributed to the design of the system because the design and construction were not acts attributable to the county. Phillips, 136 Wash.2d at 966, 968 P.2d 871:
The County and amici cities argue they should not be liable for a design defect in a developer's system simply because they accept the system after construction in order to provide proper maintenance in the future. We agree. To have a taking, some governmental activity must have been the direct or proximate cause of the landowner's loss.
(Citations omitted.) It is undisputed that the levee system in this case has existed in some form for this entire century. There was no proof in this case that the County designed the levee system.
Further, Phillips discussed when a governmental entity may be liable as an owner of public lands or public works. In that case, a grant of summary judgment for King County was reversed, and the matter was remanded for the fact-finder to determine whether the county, as a property owner, should be responsible for a "proprietary action" respecting the county's management of its public land. Phillips, 136 Wash.2d at 967, 968 P.2d 871. The proprietary action in that case was that the county allowed the developer to install part of the drainage system across a county-owned right-of-way. In the instant case, however, Skagit County is not the owner of the levees or the property on which the levees have been built.
Phillips recognized that under certain facts the county might be liable for failure to properly maintain a public drainage system. Phillips, 136 Wash.2d at 966, 968 P.2d 871. In the instant case, however, Plaintiffs' complaint is not failure to maintain the levee system, but rather that maintenance, repair, and improvement of the system gives rise to inverse condemnation liability against the County. The record does provide evidence that the County has assisted the diking districts in the maintenance, repair, and improvement of the levee system. Specifically, Plaintiffs' expert reviewed the County's activities on levee projects in the 1980s and 1990s and
[c]oncluded that Skagit County performed virtually every aspect of the improvement projects, from developing planning, engineering, design, surveying, preparing grant applications, contracting, paying and assisting with permits.
Pls.' Responsive Br. at 15 n.31 (citing Report of Proceedings (RP) 930-32). Plaintiffs claim that the County's actions were instrumental in improving the levee system from an 8-year flood protection level in the 1960's to a 25-year flood protection level.
Despite Plaintiffs' claim, such maintenance, repair, and even improvement activities fail to give rise to liability for the damages asserted by Plaintiffs. The relief sought by Plaintiffs is not for the damage caused by the difference between a levee system at an 8-year protection level and a system with a 25 year protection level. Rather, Plaintiffs sought relief for the difference between the flood damage attributable to the levees and the flood damage that allegedly would have occurred without any levees at all. This is not simply a problem of calculating damages. Plaintiffs' theory of the case is fatally flawed *649 by the total lack of evidence of proximate cause. While Plaintiffs' inverse condemnation claim rests upon the alleged damage caused by the mere existence of the levees, they offered no evidence the County actually or proximately caused the levee system to come into existence.
Plaintiffs attempt to get around this proximate cause dilemma by using a novel approach, borrowing a theory of joint and several liability from tort law. See chapter 4.22 RCW (contributory fault statute). Over the County's objections, the trial court accepted Plaintiffs' "acting in concert" theory of joint liability, and accordingly instructed the jury. Two of the 72 jury instructions specifically define the Plaintiffs' claim for joint liability:

INSTRUCTION NO. 18
A party is liable for the conduct of another party if both were acting in concert with respect to a particular act or omission and that act or omission was a proximate cause of the plaintiff's injuries.

INSTRUCTION NO. 19
A person or entity acts in concert with another if it:
(a) acts in accordance with an agreement with another to cooperate in a particular course of conduct, or to accomplish a particular result, or pursuant to a common design with another. The agreement may be expressed in words or implied from the conduct itself; or
(b) knows that the other person's or entity's conduct constitutes a taking or damaging and gives substantial assistance or encouragement to the other to so conduct itself; or
(c) gives substantial assistance to the other person or entity in accomplishing a taking or damaging and its own conduct, separately considered, constitutes a taking or damaging to any plaintiff.
CP at 1853-54.
Under these instructions, the jury could have found the County liable if it simply gave substantial assistance or encouragement to the diking districts in building or raising their dikes. Plaintiffs argue that it is appropriate to recognize a hybrid between eminent domain and tort theories. Plaintiffs propose imposing tort theory for inverse condemnation cases despite conceding that Kincaid v. City of Seattle, 74 Wash. 617, 620-21, 134 P. 504 (1913), provides the general principle that the State, when taking property for public use, "goes not as a trespasser ... [or]... a wrongdoer." Pls.' Responsive Br. at 50-51. Plaintiffs rely on this court's statement in McPherson Bros. Co. v. Douglas County, 150 Wash. 221, 224, 272 P. 983 (1928), that "the general principle in Kincaid `cannot be invoked by the State, save when the latter is proceeding in accordance with law and along constitutional lines.'" Pls.' Responsive Br. at 51 (also citing Kincaid, 74 Wash. at 620-21, 134 P. 504). Plaintiffs argue that
[a]s the McPherson court held a governmental taking of private property without first paying just compensation as required under Article 1 § 16 of the Washington State Constitution, is "unlawful and in violation of [the owner's] constitutional rights."
Pls' Responsive Br. at 51 (second alteration in original) (quoting McPherson, 150 Wash. at 225, 272 P. 983).
Despite these arguments, McPherson is easily distinguishable because there the plaintiffs did not seek inverse condemnation, but rather, sought an injunction against the county's pending condemnation action. McPherson, 150 Wash. at 222-24, 272 P. 983. Moreover, if a hybrid of eminent domain and tort were recognized, this court would be required to recognize the County's statutory immunity under RCW 86.12.037.[13] Such immunity is inapplicable only when the alleged violation is solely based on constitutional grounds. See Paulson v. Pierce County, 99 Wash.2d 645, 652, 664 P.2d 1202 (1983). Providing a tort or quasi-tort remedy might also implicate the general county immunity statute currently set forth in chapter 4.96 RCW, titled "Actions Against Political Subdivisions, Municipal and Quasi-Municipal Corporations." *650 While it might be justified in the appropriate case to recognize an inverse condemnation action as a hybrid of eminent domain and tort theories, such an approach would not benefit this case given the lack of proximate cause between the County's alleged actions and the mere existence of the levees.
The "acting in concert" tort theory submitted to the jury, therefore, does not state the correct standard for liability in an inverse condemnation action, as set forth in Phillips. Phillips did not create a new standard for governmental liability in an inverse condemnation action, it merely followed prior case law. "To have a taking, some governmental activity must have been the direct or proximate cause of the landowner's loss." Phillips, 136 Wash.2d at 966, 968 P.2d 871 (citing Lambier v. City of Kennewick, 56 Wash.App. 275, 283 n. 4, 783 P.2d 596 (1989); Peterson v. King County, 41 Wash.2d 907, 252 P.2d 797 (1953); and Gaines v. Pierce County, 66 Wash.App. 715, 726, 834 P.2d 631 (1992)). Plaintiff's "acting in concert" standard clearly falls short of the active, proprietary participation  participation without which the alleged taking or damaging would not have occurred  which is required under Phillips before liability can attach in this inverse condemnation action. See Gaines, 66 Wash.App. at 726, 834 P.2d 631.
In sum, Plaintiffs' claims rest solely on the mere existence of levees which are owned by independent diking districts. These diking districts are "separate and distinct corporation[s]" conducting their activities "free from the control of county authorities." Bale v. Floyd, 199 Wash. 503, 505, 91 P.2d 1025 (1939); cf. RCW 85.05.010 (diking districts have the power to sue and be sued). The County did not build, own, or manage these levees or the property upon which they were built. The County's repairs or improvements, even if in a concerted effort with the independent diking districts, do not, as a matter of law, render them liable for the mere existence of those levees. Furthermore, Plaintiffs' "acting in concert" theory is entirely inapplicable to this inverse condemnation action. As a result, Plaintiffs fail to state a valid legal theory for imposing liability against the County. We reverse and remand this case to the trial court for dismissal. Additionally, having found no liability against the County, there is no basis for the County's contribution claim against the State because the claim against the State is derivative.
Second Issue: Does the common enemy doctrine also preclude Plaintiffs from recovering any damages in this case?
Even if Plaintiffs had stated a valid legal claim for imposing liability against the County, a valid defense exists. If the County had been legally responsible for the existence of the levees, then the County should have been able to raise the common enemy doctrine as a defense to this action. We find the defense controlling.
The trial judge disallowed the County's reliance on the common enemy defense when it refused the County's proposed jury instruction:
It is a defense in this action that constructing, maintaining, and fortifying the levees in and around the cities of Burlington and Mount Vernon is permitted by the common enemy doctrine.
The common enemy rule allows a landowner or one acting for the landowner to repel surface water from that landowner's property with dikes, regardless of the fact that the water may enter upon and injure adjoining land. Once water overtops the banks of the river, it becomes surface water. If you find that the dikes were constructed or maintained for the purpose of repelling surface water, then you cannot find the County liable for a taking.
CP at 2,277 (footnote omitted).[14] On appeal the County reasserts its claim that, even if it *651 was legally responsible for the existence of the levees, it should have been able to raise the common enemy doctrine as a defense to this action. The County argues that the common enemy doctrine would provide a complete defense to its liability. The County is correct.
For over a century, Washington courts have adhered to the common enemy doctrine. See DiBlasi v. City of Seattle, 136 Wash.2d 865, 875, 969 P.2d 10 (1998); Cass v. Dicks, 14 Wash. 75, 78, 44 P. 113 (1896). This principle "provides that surface water is `an outlaw and a common enemy against which anyone may defend himself, even though by so doing injury may result to others.'" DiBlasi, 136 Wash.2d at 875, 969 P.2d 10 (quoting Cass, 14 Wash. at 78, 44 P. 113). If a landowner "in the lawful exercise of his right to control, manage or improve his own land, finds it necessary to protect it from surface water flowing from higher land, he may do so, and if damage thereby results to another, it is damnum absque injuria [injury without redress]." Cass, 14 Wash. at 78, 44 P. 113.
The chief characteristic of surface water is its inability to maintain its identity and existence as a body of water. It is thus distinguished from water flowing in its natural course or collected into and forming a definite and identifiable body, such as a lake or pond. Under long standing Washington law,
[w]aters escaping from the banks of a river at times of flood are surface waters, and are waters which an owner of land may lawfully protect against by dikes and fills on his own property, even though the effect is to cause an increased flow of water on the lands of another to the damage of his lands.
Morton v. Hines, 112 Wash. 612, 617, 192 P. 1016 (1920); see also DeRuwe v. Morrison, 28 Wash.2d 797, 184 P.2d 273 (1947); Harvey v. Northern Pac. Ry. Co., 63 Wash. 669, 674-75, 116 P. 464 (1911); Cass, 14 Wash. at 78;, 44 P. 113 2 Henry Philip Farnham, Waters and Water Rights 2558-2569, §§ 879-880b (1904). Although early Washington cases applying the common enemy doctrine broadly classified floodwaters as surface waters, Harvey, 63 Wash. at 674-76, 116 P. 464; Cass, 14 Wash. at 78, 44 P. 113, later cases have modified this broad statement. See Sund v. Keating, 43 Wash.2d 36, 42-46, 259 P.2d 1113 (1953); see also Marshland Flood Control Dist. v. Great Northern Ry. Co., 71 Wash.2d 365, 428 P.2d 531 (1967).
Sund held that floodwaters still flowing within a defined "flood channel" cannot be diverted out of the channel without incurring liability for resulting damages, thus, partially limiting those earlier cases which classified any floodwaters as surface waters. See Sund, 43 Wash.2d at 44-45, 259 P.2d 1113. While Sund narrows the concept of surface waters, it does not change the rule that landowners seeking to protect against surface waters can build levees without incurring liability for damages, even when those levees keep floodwaters within the confines of a stream. See Id.[15]
Plaintiffs argue the common enemy doctrine does not apply here because the floodwaters repelled by the levees remain in a defined channel. In addition to offering no proof regarding the Skagit River's "defined flood channel," Plaintiffs' argument completely misses the point of the common enemy doctrine. The common enemy doctrine's purpose is to provide landowners with the ability to prevent damage to their property caused by flooding water. The resulting illogic of Plaintiffs' argument is that a landowner who is damaged by surface waters loses the common enemy defense as soon as they build levees which repel those surface waters back into the river channel.
*652 If it were responsible for the existence of the levees, the county still would not lose the ability to invoke the common enemy doctrine simply because the water, after being repelled by the levees, returns to the defined river channel. If the character of the water after being repelled by the levees is controlling on whether the common enemy doctrine applies, no levee builder could ever rely on the defense. Under Plaintiffs' theory, no dike district may ever build dikes to protect its landowners without paying substantial damages to those landowners who choose not to build levees to protect their own property.
In formulating the rule enunciated in Sund, the court considered a flood that did not exceed in size those floods which ordinarily occurred in that region. A case note emphasizes the importance of this aspect of the case:
The courts have shown a decided reluctance to apply any of the above tests [to determine what is the watercourse] where the area innundated [sic] is a broad alluvial valley. In one such case ... the court indicated that a valley varying in width from one mile to one mile and a half could not properly be called a watercourse. Another recognized the rule allowing a landowner to protect himself without liability as to extraordinary floods but indicated it was highly unreasonable to reach the result that the whole Mississippi valley was a part of the watercourse.
Lawrence S. Moore, Washington Case Law-1953, Real PropertyRiparian Rights Floodwaters and the Common Enemy Doctrine, 29 Wash. L.Rev. 87, 160 (1954) (footnotes omitted).
In their response, Plaintiffs note that
once [surface] waters have "joined the course of a stream," and have "become subject to its current," they "[cease] to possess the characteristics of diffused or vagrant surface waters and become part of the stream...." Sund v. Keating, 43 Wash.2d 36, 42, 259 P.2d 1113 (1953). Waters flowing through natural watercourses, like the Skagit River, are not surface waters.
Pls.' Responsive Br. at 45 (footnotes omitted). This response fails to acknowledge that the waters against which the diking districts built dikes were surface waters, because without those dikes the waters were no longer subject to the current of the Skagit River and would have fanned out throughout the entire floodplain.
In the instant case, the evidence presented at trial supports classifying the overbank floodwater from the Skagit River as surface water. The floodplain, covering over 90,000 acres, consists of "[t]he entire floor of the Skagit River Valley, the deltas of the Samish and Skagit Rivers, the reclaimed tidelands adjoining the Skagit, Samish, and Stillaguamish River Basins...." Ex. 49, at 2-2 to 2-3. Historically, the Skagit River's floodwaters have not only fanned out over the entire Skagit River Valley, but have actually departed from the Skagit River basin and moved into drainage basins of entirely different rivers. This conclusion is supported by Plaintiffs' own expert.[16]
Relying on the principles endorsed by Sund, the County asserts it is not liable for Plaintiffs' damages because the levees were merely constructed to protect against these overbank floodwaters. Considerable evidence supports this assertion. Dike District No. 12's dikes are all located approximately 50 feet to 1,000 feet away from the river bank. As long as the river remains within its banks, it does not contact the dikes and, thus, the levees have no influence on the river. *653 The purpose of the dikes is to control escaping floodwaters and not to have any effect on nonflooding river water.[17]
Given these facts, the overbank floodwaters guarded against by these levees qualify as surface water. Plaintiffs' own expert testified that without levees the floodwater has historically moved into the drainage basins of an entirely different river. This fact lends credence to our conclusion that the Skagit River's floodwater became severed from the river's main current and was, thus, surface water.
Plaintiffs attempt to rely on Colella v. King County, 72 Wash.2d 386, 433 P.2d 154 (1967), to say that even if the waters are surface waters, such surface waters may not "`be artificially collected and discharged upon adjoining lands in quantities greater than or in a manner different from the natural flow thereof.'" Pls.' Responsive Br. at 46 (quoting Colella, 72 Wash.2d at 390, 433 P.2d 154). This is a recognized exception to the common enemy doctrine. See DiBlasi v. City of Seattle, 136 Wash.2d 865, 874, 969 P.2d 10 (1998). Colella and DiBlasi, however, are entirely distinguishable.
In Colella, King County collected surface water from a road and artificially diverted it from its natural flow through a culvert into a ravine on the plaintiff's property. Colella, 72 Wash.2d at 390, 433 P.2d 154. Similarly, DiBlasi involved a municipality's liability for artificial diversion of water through its streets. DiBlasi, 136 Wash.2d at 879, 969 P.2d 10. In contrast here, however, the levees do nothing to artificially collect and discharge floodwaters. The levees along the Skagit River simply repel overbank floodwaters back to the flooded river channel. If this repelling action of a levee constitutes artificial channeling, then the exception would swallow the rule and common enemy doctrine could never be invoked.
In sum, the levees constructed protected against overbank floodwaters which were surface waters and, thus, were of the type which the landowners could properly protect against. Under the common enemy doctrine, the landowners were entitled to build levees to repel these surface waters back into the river channel. Finally, the levees here did not artificially collect and discharge the floodwaters, as proscribed under DiBlasi, 136 Wash.2d at 879, 969 P.2d 10, and Colella, 72 Wash.2d at 389, 433 P.2d 154. Consequently, we find that had the County been responsible for the existence of levees, the common enemy doctrine would have provided a defense to the County's liability.

CONCLUSION
Finding Plaintiffs have failed to state a valid legal claim for imposing liability on the County for the existence of the dikes, we see no reason to address the additional issues raised by the parties in this case. Further, even if it was responsible for the existence of the levees, the County would have a defense to liability under the common enemy doctrine. We reverse the verdict and remand for dismissal of the action. Additionally, the trial court's writ of mandamus is vacated.
GUY, C.J., SMITH, JOHNSON, MADSEN, ALEXANDER, TALMADGE, SANDERS, J.J., and HOUGHTON, J.P.T., concur.
NOTES
[1] Article I, section 16 (amendment 9).
[2] Both Skagit County and two diking districts were named as defendants. The County subsequently brought third-party contribution and indemnity claims against the State of Washington and Burlington Northern Railroad. Although Burlington Northern and the diking districts were dismissed from the suit, the County and the State of Washington were found liable.
[3] Because these holdings are determinative, it is unnecessary to discuss the various additional claims raised by the parties.
[4] Pls.' Responsive Br. on Appeal and Br. in Supp. of Cross-Appeal at 8 (hereinafter Pls.' Responsive Br.)
[5] Clerk's Papers (CP) at 5,463.
[6] Ex. 49, at 2-5 to 2-7.
[7] Report of Proceedings at 12,578.
[8] CP at 5,519.
[9] CP at 5,493.
[10] CP at 5,489-530.
[11] CP at 5,487-88.
[12] RCW 86.12.037, titled "Liability of county or counties to others," states, in part,

No action shall be brought or maintained against any county alone or when acting jointly with any other county under any law, its or their agents, officers or employees, for any noncontractual acts or omissions of such county or counties, its or their agents, officers or employees, relating to the improvement, protection, regulation and control for flood prevention and navigation purposes of any river or its tributaries and the beds, banks and waters thereof....
[13] See footnote 12, supra.
[14] The portion of the instruction defining surface waters as all overbank waters may have been incomplete. See Sund v. Keating, 43 Wash.2d 36, 42-46, 259 P.2d 1113 (1953) (waters escaping the banks of a river and flowing into a defined flood channel are not surface waters). Nonetheless, any problem with this instruction is of no consequence here because there is no evidence in the record that the overbank floodwaters flowed within a defined flood channel. To the contrary, even Plaintiffs' expert testified that, absent these levees, the floodwaters would have diffused over the entire floodplain, escaping into an entirely separate river drainage basin. RP at 894; see also discussion below.
[15] The court in Sund sought to reconcile an apparent conflict with earlier case law concerning surface waters by stating "[t]his holding is not inconsistent with the line of authority established in Cass v. Dicks, supra, where waters which have escaped over the banks of a stream and have become diffused and vagrant surface waters (no longer properly a part of the watercourse), were properly classified as surface waters." Sund, 43 Wash.2d at 44-45, 259 P.2d 1113.
[16] On this subject, Plaintiffs' expert, Dr. Mutter, testified,

[I]f there were no levees, the water would  rather than being confined by the corridor as we see  rather than being confined by these narrow corridors, the flow would fan out. In fact, this entire delta was created in earlier times by the channel moving pretty much wherever it felt like, and it would be free to do so again. Flow would fan out over the delta at very shallow depth.
. . . .
... At higher flows there's always the possibility of diversions from even as far upstream as the Sterling area, the Samish Basin and Padilla Bay. That's happened historically also.
RP at 894. Therefore, even according to Dr. Mutter, the floodwater in question would not only fan out over the floodplain, it would also overflow into the drainage basin of a different river, the Samish.
[17] RP at 12,578.