[No. 9495-2-III. Division Three. December 12, 1989.]

DARWIN LAMBIER, ET AL, *Respondents,* v. THE CITY OF KENNEWICK, ET AL, *Appellants.*

276

*William Cameron,* for appellants.

*Daryl Jonson* and *Cowan, Walker, Jonson & Moore,* for respondents.

THOMPSON, C.J.—The City of Kennewick appeals a judgment awarding Darwin and Lois Lambier $25,000 plus attorney fees for inverse condemnation. The City argues primarily that its actions did not constitute a "taking" pursuant to Const. art. 1, § 16 (amend. 9). We affirm.

In 1972, Benton County and the City of Kennewick built a railroad underpass on Canal Drive east of Yost Avenue. Canal Drive makes an S–shaped curve under the rail line.

The 1972 project involved construction of a roadway wide enough for four lanes of traffic in the immediate area of the underpass. The roadway near Yost Avenue remained two lanes wide.

The Lambiers bought their home, located at the northeast corner of the intersection of Canal Drive and Yost Avenue, in 1976 for $38,000.

Canal Drive was improved again in 1980, widening it to four lanes and adding curbs and gutters from the area of the underpass west past the Lambiers' property to Columbia Center Boulevard. The street then was annexed by the City of Kennewick.

As part of the 1980 project, Mr. Lambier agreed to permit the County to relocate his driveway. In 1980, the County and the Lambiers entered into an "Agreement for Construction Encroachment (Right of Entry)", in which the Lambiers agreed to permit the County to construct roadway embankment slopes and to plant bushes on the embankment beyond Canal Drive right of way. The Lambiers received $660 consideration for this agreement.

In 1979, Mr. Lambier complained to Benton County authorities that at least two vehicles had failed to negotiate the Canal Drive curve and had come to rest on his property. The County Engineer replied that the planned widening project and the addition of curbs and gutters would mitigate Mr. Lambier's concerns. However, the Lambiers presented evidence at trial indicating at least 11 vehicles careened off Canal Drive and landed on their property after the 1980 widening project. Four of those incidents resulted in claims with their home insurer totaling $4,470.30, and with their vehicle insurer totaling approximately $300. On the basis of this evidence, the trial court concluded the Lambiers' property had "suffered the incursion of eleven or twelve vehicles" from Canal Drive since the 1980 improvements.

After the street was annexed by the City, Mr. Lambier took his complaints to officials there, but in 1986 the City's

director of public works notified the Lambiers the City would take no action.

In 1985, the Grange Insurance Co. canceled the Lambiers' homeowners policy because of the damage claims. Several other insurers refused coverage, but the Lambiers finally obtained insurance from Allstate, whose application form did not ask about prior claims of the type the Lambiers had filed.

Also in 1985, the Lambiers listed the property for sale for $63,000. They received no offers, and one realtor testified the property was not salable at any price. Another realtor who testified for the Lambiers said disclosure of the vehicle incursions would make the property very difficult to sell, and probably no buyer would pay more than $20,000 for it. The City's expert agreed the property would be very difficult to sell if the problems were disclosed to potential buyers.

The Lambiers initiated this action in October 1986, alleging inverse condemnation and negligence by the City and Benton County. The City's answer raised as affirmative defenses the issues of accord and satisfaction, failure to file a claim in accordance with RCW 35A.31.030 and the "applicable" statute of limitation.

At trial, plaintiff's expert Don Johnston testified the curve near the Lambiers' property was designed "contrary to good engineering practice and policies, of design policies of the State." Two experts called by the City testified the curve complied with design criteria, and was safe for travel at the posted speed limit.

The trial court found that defects in the design and construction of Canal Drive caused the incursion of vehicles onto the Lambiers' property. The court also found that the property had a value of $43,500, and the incursion of vehicles from Canal Drive had reduced the value of the property by $25,000, to $18,500.[1] The court concluded the

---

[1]The court made no findings or conclusions regarding the negligence allegation. We do not address the portion of the City's brief that relates to negligence

continuing intrusion of vehicles onto the Lambiers' property constituted a "taking" without just compensation, in violation of Const. art. 1, § 16 (amend. 9), and set damages at $25,000 plus reasonable attorney fees. The City appeals the $32,442.75 judgment.

In this appeal, the City assigns error to virtually all of the court's substantive findings. We have reviewed the record, and, to the extent this appeal challenges the sufficiency of the evidence, we hold the court's findings are fully supported.

### INVERSE CONDEMNATION

The City first contends the facts do not establish a cause of action for inverse condemnation. Const. art. 1, § 16 (amend. 9) provides in pertinent part:

No private property shall be taken or damaged for public or private use without just compensation having been first made . . ..

■ A "taking" has occurred when government conduct interferes with the use and enjoyment of private property, with a subsequent decline in market value. *Martin v. Port of Seattle*, 64 Wn.2d 309, 320, 391 P.2d 540 (1964), *cert. denied*, 379 U.S. 989 (1965). The term "inverse condemnation" is used to describe an action alleging a governmental "taking", brought "to recover the value of property which has been appropriated in fact, but with no formal exercise of the power". *Martin*, at 310 n.1 (citing *Thornburg v. Port of Portland*, 233 Or. 178, 376 P.2d 100 (1962)).

The City contends the trial court erred in finding fault with the City's conduct. It points out the Lambiers' damages were "neither contemplated by the plan of work nor a necessary incident to the building or maintenance of the road . . .". *Seal v. Naches–Selah Irrig. Dist.*, 51 Wn. App. 1, 10, 751 P.2d 873, *review denied*, 110 Wn.2d 1041 (1988). In *Seal*, the plaintiffs claimed leakage from an irrigation canal caused damage to their cherry orchard. They alleged

issues, except where the questions are relevant to the issue of inverse condemnation.

negligence, trespass, nuisance and an uncompensated "taking", but only the negligence issue was presented to the jury. The jury found 95 percent contributory negligence, and the plaintiffs appealed the court's refusal to instruct the jury on the other issues. *Seal*, at 2–4. Relying on *Songstad v. Metropolitan Seattle*, 2 Wn. App. 680, 472 P.2d 574 (1970), the court upheld the trial court's refusal to instruct the jury on inverse condemnation because the alleged damages were not planned or anticipated in the construction of the canal. *Seal*, at 9–10. The case appears to hold that an unintended consequence of a governmental project cannot be a "taking", which would preclude recovery by the Lambiers here.

*Seal* and *Songstad* are factually distinguishable. *Seal*, at 8 n.2, noted the allegation there did not involve "an affirmative act of construction . . . which directly resulted in damage to property". Here, the City and County affirmatively undertook the construction project that resulted in the Lambiers' damages. And in *Songstad,* the plaintiffs alleged the City had permitted rocks and earth to wash or precipitate onto their property. The court affirmed the trial court's refusal to instruct the jury on inverse condemnation in part because the damages were not permanent, but were merely a "temporary interference" with their plans for the property. *Songstad,* at 685. As is discussed more fully below, the intrusion here is permanent in nature.

Both *Seal* and *Songstad* rely on *Jorguson v. Seattle,* 80 Wash. 126, 130–31, 141 P. 334 (1914), *overruled sub nom. Wong Kee Jun v. Seattle,* 143 Wash. 479, 505, 255 P. 645, 52 A.L.R. 625 (1927), in which the court stated:

[Article 1, section 16] was never intended to apply to consequential or resultant damages not anticipated in, nor a part of, the plan of a public work. It was never intended to apply to damages resulting to private property from the negligent or wrongful use of public property.

However, the Supreme Court abandoned the *Jorguson* rule in *Wong Kee Jun v. Seattle, supra;*[2] *see State v. Williams,* 12 Wn.2d 1, 11–14, 120 P.2d 496 (1941); *Boitano v. Snohomish Cy.,* 11 Wn.2d 664, 657–77, 120 P.2d 490 (1941); *see also* W. Stoebuck, *Nontrespassory Takings in Washington* § 1.5, at 5 n.1 (1980); Annot., *Damage to Private Property Caused by Negligence of Governmental Agents as "Taking," "Damage," or "Use" for Public Purposes, in Constitutional Sense,* 2 A.L.R.2d 677, 689–90 (1948). To the extent *Seal* and *Songstad* rely on *Jorguson,* they are not authoritative.

■ The unintended results of a governmental act may constitute a "taking". This principle is implicit in the holdings of cases involving uncompensated "takings" of property neighboring Seattle–Tacoma International Airport, in which increased aircraft noise and vibration obviously were not intended consequences, or even perhaps anticipated results,[3] of the airport construction. *See Highline Sch.*

---

[2]In *Wong Kee Jun,* the plaintiffs alleged the City's regrade of adjacent streets caused a slide onto their property. The court held:

"We may accept the holding of the *Jorguson* case to the effect that [article 1, section 16] has sole reference to such taking or damaging as is contemplated in the exercise of the power of eminent domain and is a mere limitation upon the otherwise unlimited sovereign power to take or damage private property for a public use; and yet it must follow that, whenever property is thus taken, voluntarily or involuntarily, by the sovereign state or by those to whom it has delegated this sovereign power, the courts must look only to the taking, and not to the manner in which the taking was consummated. . . .

"The great mass of our cases, as hereinbefore reviewed, seem to so hold, and . . . the only inharmony arises from the *Casassa* [*v. Seattle,* 75 Wash. 367, 134 P. 134 P. 1080 (1913)] and the *Jorguson* cases and those which attempt to follow them. In the beginning they were a not unjustified attempt to draw a distinction which does exist, but the line drawn was too fine, and results show that it leads to confusion. So far as out of harmony with what is here said, those cases are overruled." *Wong Kee Jun,* at 504–05.

[3]In *Highline Sch. Dist. 401 v. Port of Seattle,* 87 Wn.2d 6, 8, 548 P.2d 1085 (1976), the court pointed out the significant increases in both the quantity and quality of noise and use since the airport's early years, as well as the introduction of noisier turbofan jet powered planes.

*Dist. 401 v. Port of Seattle,* 87 Wn.2d 6, 548 P.2d 1085 (1976); *Martin v. Port of Seattle, supra; see also Ulery v. Kitsap Cy.,* 188 Wash. 519, 523, 63 P.2d 352 (1936).

The City next argues the Lambiers' damages were not the result of lawful governmental activities, but of the unlawful and unintended acts of the drivers of the vehicles. This argument appears to be directed to two additional questions: (1) whether the acts of individual members of the public can result in a "taking"; and (2) whether the evidence at trial established the necessary causal connection between the design and construction of Canal Drive and the Lambiers' damages.

 These questions appear to take issue with the trial court's finding that the incursions onto the Lambiers' property were caused by defects in the design and construction of the roadway. The City points out third party drivers actually caused the damages. A similar question was addressed in *Ackerman v. Port of Seattle,* 55 Wn.2d 400, 412–13, 348 P.2d 664 (1960), another case involving Sea–Tac Airport:

> We must now take up the question of whether, under the facts alleged, the Port—which operates no planes—can be liable for the alleged taking. . . . [T]he liability of the Port in appellants' complaints is predicated on the Port's alleged failure to provide adequate facilities, necessitating the frequent low flights over the appellants' land (and thus, as we have seen, through the appellants' private airspace). Having the power to acquire an approach way by condemnation, the Port, allegedly, failed to exercise that power, with the result that the appellants' private airspace is allegedly being used as an approach way, without just compensation first having been paid to them. Clearly, an adequate approach way is as necessary a part of an airport as is the ground on which the airstrip, itself, is constructed, if the private airspace of adjacent landowners is not to be invaded by airplanes using the airport. The taking of an approach way is thus reasonably necessary to the maintenance and operation of the airstrip.

Similarly here, the Lambiers' complaint is predicated on the defects in the design and construction of Canal Drive. There is ample support in the record for the court's finding

the Lambiers' damages were *caused*[4] by those defects, and they have made out a valid claim for inverse condemnation.[5]

The City also argues the Lambiers' damages are not permanent, but are the result of occasional incursions by errant vehicles. It attempts to distinguish these facts from those in the Sea–Tac cases, in which the intrusions were regular and routine. To constitute a "taking", the intrusion must be "chronic and unreasonable", *Orion Corp. v. State,* 109 Wn.2d 621, 747 P.2d 1062 (1987), *cert. denied,* 486 U.S. 1022, 100 L. Ed. 2d 227, 108 S. Ct. 1996 (1988), and not merely a temporary interference, unlikely to recur. *Northern Pac. Ry. v. Sunnyside Vly. Irrig. Dist.,* 85 Wn.2d 920, 924, 540 P.2d 1387 (1975); *see Songstad v. Metropolitan Seattle, supra* at 685. Here, in view of the court's finding the incursions were caused by the defects in the street, recurrence is not only likely but inevitable. Also, the Lambiers' damage is permanent, at least so long as the defects in the street remain.

The City also argues it should have been obvious to the Lambiers when they purchased their property that a vehicle that failed to negotiate the curve would wind up on their property. Thus, it argues, because the condition existed at the time of purchase, it was considered in the purchase price. This argument conflicts with the court's findings that the 1980 redesign and reconstruction project caused the vehicles to leave the roadway. Although there is evidence of incidents before 1980, the inference is that the 1980 project, widening the roadway to four lanes through

---

[4]The City appears to argue that the trial court's finding on causation indicates it was basing liability on a negligence theory. However, "to have a taking, some governmental activity must have been the direct or proximate cause of the landowner's loss". W. Stoebuck § 1.5, at 5 (citing *Peterson v. King Cy.,* 41 Wn.2d 907, 252 P.2d 797 (1953) and *Clark v. Seattle,* 156 Wash. 319, 287 P. 29 (1930)). The question of proximate causation generally is an issue to be determined by the trier of fact. *Goucher v. J.R. Simplot Co.,* 104 Wn.2d 662, 676, 709 P.2d 774 (1985).

[5]The City points out that some drivers of errant vehicles were cited for various infractions, but others were not.

the area near the Lambiers' property, fostered faster travel, a factor that made the curve particularly dangerous.

Counsel for the City has argued vigorously and repeatedly that the facts of this case do not establish a cause of action for inverse condemnation.[6] However, a comment in oral argument is revealing. Reflecting on the City's decision not to erect guardrails along Canal Drive, counsel explained the City simply made a choice between damage to the Lambiers' bushes and the possibility of deaths from vehicles striking the guardrails. The judgment in this case does not fault the City for this choice. It merely compensates the Lambiers for the resulting diminution of value of their property.

## STATUTE OF LIMITATION

Next, the City contends the Lambiers' action for inverse condemnation is barred by the statute of limitation. An initial question is whether the City raised this issue before the trial court. The City admits in its opening brief that the issue "has not been directly raised in this case . . .". Reference to a statute of limitation in the City's answer may refer to the time limit for filing a claim under RCW 35A-.31.030. However, the City contends it was only when the Lambiers presented evidence at trial that it became aware they were alleging a defect in the design of the curve, which they contend was completed in 1972. Thus, the City argues, it was only at trial that the statute of limitation defense became an issue.

If this is true, the City appears to have failed to press its case. Its objections to the proposed findings refer to the statute of limitation only in connection with its argument

---

[6]The Lambiers' innocence, coupled with their injury, "does not . . . a cause of action make against the nearest municipal corporation", counsel argues. He also has chided opposing counsel for "thaumaturgic repetition" of various words and for "paint[ing] the County and City with vituperative anthropomorphic epithets". We appreciate counsel's attempts to improve our vocabulary, but adhere to the belief that simplicity promotes clarity. "'If men would only say what they have to say in plain terms,' wrote Samuel Taylor Coleridge, 'how much more eloquent they would be!'" H. Weihofen, *Legal Writing Style* ch. 4, at 57 (1961).

regarding the preexisting defect. It provided no argument or support for the reference to the statute of limitation.

■■ Moreover, the City's argument is without substantive merit.

> It is well settled in Washington that where a taking occurs by eminent domain or by inverse condemnation, a landowner's right to seek just compensation may not be barred merely by the passage of time. *Peterson v. Port of Seattle,* 94 Wn.2d 479, 483, 618 P.2d 67 (1980); *Highline Sch. Dist. 401 v. Port of Seattle,* 87 Wn.2d 6, 15, 548 P.2d 1085 (1976). In both *Peterson* and *Highline,* we held that the government must prove all the elements of adverse possession[,] including the 10-year prescription period, before a claim for compensation would be barred.

*Valley View Indus. Park v. Redmond,* 107 Wn.2d 621, 631, 733 P.2d 182 (1987).[7] Actions of this type are limited by the 10-year prescriptive period. *Highline Sch. Dist. 401 v. Port of Seattle,* 87 Wn.2d 6, 11, 548 P.2d 1085 (1976); *see* W. Stoebuck § 3.1, at 53. The question thus is when the limitation period began to run.

> [A]n inverse condemnation action for interference with the use and enjoyment of property accrues when the landowner sustains any measurable loss of market value and the recovery may be had for the total loss of value which is both attributable to the interference and sustained during the 10-year period preceding the commencement of the action.

*Highline,* at 15. Thus, a new cause of action arises with each provable decline in value. W. Stoebuck § 3.1, at 53–54. Here, the court's findings indicate the Lambiers' damages were attributable to the incursion of vehicles beginning in 1980. These incidents all occurred within the 10-year period preceding the commencement of this action in 1986. The Lambiers' claims for compensation are not barred by the statute of limitation.

---

[7] In *Orion Corp. v. State, supra* at 634, the court held the adverse possession theory did not apply to cases of regulatory takings, noting such takings never could meet the requirements of adverse possession. It held *some* statutes of limitation must apply, but declined to adopt a particular period because the action was timely under any of the alternatives. *Orion,* at 635. Nevertheless, *Orion* leaves undisturbed the 10-year limitation period for inverse condemnation actions alleging physical invasion.

The judgment is affirmed.

Pursuant to RCW 2.06.040, the remaining contentions and the court's answers to those contentions, having no precedential value, will not be published.

GREEN and SHIELDS, JJ., concur.

Reconsideration denied January 10, 1990.

Review denied at 114 Wn.2d 1016 (1990).