IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| JACKASS MT. RANCH, INC.;<br>DAVE and AMI MACHUGH,<br>d/b/a JACKASS MT. RANCH,<br><br>        Appellants,<br><br>        v.<br><br>SOUTH COLUMBIA BASIN<br>IRRIGATION DISTRICT,<br><br>        Respondent,<br><br>DICK CONRAD, d/b/a<br>CONRAD ORCHARDS,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 30270-9-III<br><br><br><br><br><br>PUBLISHED OPINION |

KULIK, J. — In 2006, a landslide damaged a cherry orchard belonging to Jackass Mountain Ranch and Dave and Ami MacHugh (collectively referred to as "JMR"). JMR brought suit against the South Columbia Basin Irrigation District (SCBID), contending that the landslide was a direct and proximate result of the creation and maintenance of the Ringold Wasteway (wasteway), which SCBID operated. JMR asserted multiple claims, including inverse condemnation, negligence, res ipsa loquitur, and trespass. Franklin

County Superior Court granted summary judgment in favor of SCBID on all claims. Of importance, the court determined that the evidence clearly established that the seepage that caused the landslide was due to the design and construction of the wasteway by United States Bureau of Reclamation (USBR). Thus, liability for damages resulting from design and construction could not be imputed to SCBID. Furthermore, the court concluded that JMR failed to produce evidence that SCBID negligently operated or maintained the wasteway. JMR appeals. We agree with the trial court and affirm summary judgment in SCBID's favor.

## FACTS

In 1935, the United States authorized construction, operation, and maintenance of the Grand Coulee Dam Project. Renamed the Columbia Basin Project, one of the purposes of the project is to provide water for agricultural irrigation to 1,029,000 acres of semi-arid land in central Washington. The irrigation system transports water from a storage facility called Banks Lake through canals to the irrigated lands. The Columbia Basin Project is divided into three irrigation districts, one of which is the SCBID. USBR planned, designed, engineered, and constructed the system operated by SCBID.

SCBID and the other irrigation districts contracted with USBR to provide maintenance and operation services for the Columbia Basin Project. USBR and SCBID

2

entered into a repayment contract in December 1968. The contract transfers responsibility for the operation and maintenance of the transferred works to SCBID. The transferred works consists of all irrigation and drainage works, constructed or to be constructed, serving or to serve lands within the district. The repayment contract provides that the title to the transferred works remains with the United States.

The contract provides that SCBID is obligated to perform and administer the water service contracts of the United States by delivering water via the transferred works to the landowner. The United States retains ownership over all waters delivered to the farmers under the contract, including waste, seepage, or return flow waters attributable to the irrigation of lands. USBR determines which land receives water and the amount of water to be distributed to each unit of land. Any modification of existing water service contracts by SCBID requires approval by USBR.

SCBID is required to maintain the standard of care set by the USBR for operation and maintenance. SCBID is obligated to care for, operate, and maintain the transferred works in compliance with the terms of the contract and in such a manner that the transferred works remain in good and efficient condition. The contract states that no substantial change shall be made by SCBID in any of the major transferred works without first obtaining the written consent of USBR. However, SCBID is required to promptly

3

make any and all repairs to the transferred works that are necessary for proper care, operation, and maintenance of the transferred works.

USBR, in conjunction with SCBID, may review the maintenance program of the district to determine the adequacy of the program. This review includes an inspection by USBR of the transferred works to determine if the terms of the contract are being satisfactorily performed by the district and what corrective measures need to be taken to correct any deficiencies in the maintenance of such transferred works.

If a transferred work is found deficient, the contract provides that USBR will modify, improve, or replace those transferred works that have been constructed but which do not perform satisfactorily or where the constructed facility is inadequate. USBR and SCBID shall provide to each other reports of the operation and maintenance program on the transferred works.

In instances where the right-of-way has not been acquired, the contract provides that the United States shall proceed to acquire those rights-of-way for the storage, seepage and overflow, conveyance, release, and discharge of waters serving lands within the project or lands affected by the operation of the project. This includes rights-of-way that become necessary to serve the completed project. The contract states that SCBID shall

4

not be held liable for any damages occasioned by the failure, neglect, or omission of the United States to secure the rights-of-way under the aforementioned provision.

"Drainage works" are defined in the contract as "project works to control and remove injurious excess surface and ground water resulting from operation of the irrigation system and the irrigation of project lands." Clerk's Papers (CP) at 318. The contract places responsibility on USBR to determine whether drainage works are necessary or economically feasible. If both criteria were present, USBR has the responsibility for design and construction of the drainage system.

The Ringold Wasteway delivers water through SCBID's district. Originally, USBR designed and constructed the wasteway to carry water from the Potholes Canal to a location on the edge of the White Bluffs where it was returned to the Columbia River down a 350-foot box flume. The flume was constructed on the south edge of an ancient landslide.

In the late 1960s, a landslide destroyed the flume. The ancient landslide area became reactivated as soon as seepage from the wasteway and irrigation activity saturated the previously dry sediments. In response, USBR placed a dike on the west end of the wasteway to terminate discharge down the flume. USBR redesigned the wasteway so that the water within the wasteway flowed away from the White Bluffs area. USBR also

5

constructed a system of underground drains in the irrigated fields and orchards to move excess water from irrigation back into the wasteway. These modifications, made by USBR, resulted in the wasteway being used as a combined water delivery and drainage system. The wasteway, as redesigned and constructed, was considered a transferred work, as defined in the repayment contract. Despite the redesign and modification of the system, three small slumps in the hillside occurred between 1981 and 1986. Another major landslide occurred in 1996.

In the 1970s, USBR investigated further development of the White Bluffs area. USBR recognized that the increase of groundwater from the proposed irrigation projects would create the danger of more landslides along the steep cliffs. As a result, USBR created the red line area, which designated the boundary area where added groundwater would directly affect the White Bluff's landslide problem. This area was found unsuitable for irrigation.

JMR's orchard is located at the base of the White Bluffs. The land at the top of the bluff, above JMR's orchard, is owned by Dick Conrad.[1] The wasteway is also located on

---

[1] JMR also filed suit against Dick Conrad and Conrad Orchards (Conrad). The trial court granted Conrad's motion for summary judgment. JMR dismissed its claims against Conrad before this appeal.

the top of the bluff, south of JMR's orchard and Mr. Conrad's orchard. This area along the White Bluff is located outside the boundaries of the red line area.

In the 1980s, USBR constructed a network of underground subdrains under Mr. Conrad's orchard to prevent soil from becoming saturated in the root zone. Water collected in this subdrain system flows into the collection facilities in the area.

In June 2006, a major landslide deposited approximately 100,000 cubic yards of material from the top of the slope onto JMR's property. The landslide covered and/or destroyed approximately seven to nine acres of JMR's orchard.

JMR initiated a claim for damages against SCBID on the theories of inverse condemnation, negligence, res ipsa loquitur, and trespass.[2] JMR contended the slide was a direct and proximate result of the creation and maintenance of the wasteway, and that SCBID failed to take appropriate precautions to prevent the landslides.

SCBID moved for summary judgment, stipulating for the motion that the seepage from the wasteway was a proximate cause of the 2006 landslide. However, SCBID contended that it was not responsible for the landslide because the seepage from the wasteway was due to the design and construction by USBR. SCBID maintained that it

---

[2] JMR also asserted claims based on absolute liability, strict liability, and nuisance. The trial court granted summary judgment in favor of SCBID on these claims. JMR has not pursued these claims on appeal.

7

inherited the wasteway and did not have ownership or contractual authority to alter the wasteway. Therefore, SCBID's only responsibility was to exercise reasonable care in the operation and maintenance of USBR's wasteway, which it had done.

To support its motion for summary judgment, SCBID presented the repayment contract between USBR and SCBID, which provided that USBR owned the wasteway and that SCBID would be responsible for operation and maintenance.

Additionally, SCBID presented an affidavit from operations and maintenance expert Robert Montgomery. Based on his investigations of the system and his knowledge and experience gained in 28 years in the field, Mr. Montgomery opined that SCBID's methods and practices were reasonable and well within the standard of practice for irrigation systems in the Columbia Basin and eastern Washington for minimizing the effects of seepage for water delivery systems. Mr. Montgomery found the seepage from the wasteway was consistently lower than other systems in the Columbia Basin. Mr. Montgomery stated that on all of his inspections, both before and after the 2006 landslide, he found the wasteway to be in good physical condition, well maintained, and performing as designed by USBR. He observed that the drain outlets were discharging freely or were only partially submerged, indicating that the wasteway was not backing water into the adjacent drainage systems and, therefore, was not affecting subsurface drainage.

Also before the court was a report by licensed geologists from Shannon & Wilson, Inc. The report addressed geologic and hydrogeologic observations and opinions regarding the 2006 landslide. The report concluded that the primary cause of the landslide was a result of regional irrigation causing a rise in groundwater levels throughout the area above the bluff, with higher than normal precipitation in 2006 contributing to the cause. Shannon & Wilson opined that there was no data to support an abnormal or excessive amount of seepage coming from the wasteway.

In response, JMR contended that SCBID knew the operation of the wasteway was causing landslides, yet failed to modify its operations and maintenance activities so as to prevent such landslides. JMR presented expert, Dr. Ted Vinson, PhD, who offered his opinions on seepage and causation. Dr. Vinson noted that landslides in the vicinity of the wasteway began in 1967. Dr. Vinson found a correlation between the amount of water in the wasteway and an increase in the groundwater level. Dr. Vinson concluded that "*but for* the water supplied to sustain the agricultural activities in the area by the SCBID, the flow slide of June 20, 2006, would not have occurred." CP at 120. He also concluded that the primary source of water was most certainly the wasteway.

During deposition testimony, Dr. Vinson acknowledged that he had no specific experience with canals, drainways, laterals, or delivery systems of water for dams or

9

reservoirs. He stated that he did not consider himself an expert in the field of operation and maintenance of an irrigation district, and that he could not provide the standard of care for the proper operation and maintenance of an irrigation facility. JMR stipulated that Dr. Vinson was not identified as an expert on the operations and maintenance procedures in irrigation systems.

JMR also presented the testimony of Shannon McDaniel, the secretary manager of SCBID, to establish that USBR or SCBID did not take measures to address water escaping from the irrigation system and causing landslides. Mr. McDaniel also testified that the Conrad drain system installed in the 1980s was constructed to maintain the agricultural viability of the project lands and not to address potential landslides.

The trial court granted summary judgment in favor of SCBID. Regarding the negligence claim, the court found that the evidence presented by SCBID was sufficient to shift the burden to JMR, but that JMR failed to demonstrate the existence of a material issue of fact regarding negligence. The court found that JMR failed to present evidence that SCBID's actions in the operations and maintenance of the wasteway were unreasonable or fell below the standard of practice in the Columbia Basin. The court explained that SCBID could not be held responsible for the location of the wasteway or the materials used because those issues dealt with USBR's design and construction and

not SCBID's operation and maintenance. Also, the court rejected JMR's assertion that SCBID had an obligation to modify the design of the wasteway. The court found that the repayment contract demonstrated that SCBID did not have the duty or authority to make any type of modifications to the wasteway.

The court also determined that the doctrine of res ipsa loquitur did not apply. The court found that a landslide near an irrigation drainage system is the type of event that can occur without negligence. The court relied on the testimony of Mr. Montgomery, who established that seepage is a natural consequence of the existence of an irrigation system. Furthermore, the court recognized that the Washington Supreme Court held in *Holland v. Columbia Irrigation District*, 75 Wn.2d 302, 304, 450 P.2d 488 (1969), that the proprietor of an irrigation conduit is not an insurer against damage that may result from its operation, but is liable only in instances when the proprietor is negligent. Finally, the court concluded that the doctrine of res ipsa loquitur was not applicable in this situation because the evidence regarding the cause of negligence has not been destroyed, and that SCBID clearly lacked exclusive control over the instrumentality of the damage, meaning the wasteway.

Reviewing the inverse condemnation claim, the trial court recognized that USBR's design, construction, and placement of the wasteway was the act that constituted the

taking, considering that USBR anticipated the seepage at the time of construction. Thus, liability for design and construction defects on the part of USBR did not impute to SCBID. The court stated that a taking imputable to SCBID would need evidence of negligence in operation and maintenance, which JMR did not provide.

In rejecting the claim for trespass, the trial court found that there was no evidence to support the intent requirement of trespass. The court said it was not persuaded that SCBID's knowledge that landslides occurred in the area meant that SCBID intended to cause the landslide by its operation. The court also recognized again that Washington courts have adopted a rule that liability for damage resulting from the maintenance, construction, or operation of irrigation works may only be based on negligence. Thus, as a matter of law, SCBID was not liable for damages based on a claim of trespass.

JMR appeals, contending that the trial court misapplied the controlling law and overlooked disputed issues of material fact that were established in the record.

## ANALYSIS

This court reviews a summary judgment order de novo. *Lunsford v. Saberhagen Holdings, Inc.*, 166 Wn.2d 264, 270, 208 P.3d 1092 (2009) (quoting *City of Spokane v. Spokane County*, 158 Wn.2d 661, 671, 146 P.3d 893 (2006)). All facts and inferences are viewed in the light most favorable to the nonmoving party. *Id.* (quoting *City of Spokane*,

158 Wn.2d at 671). Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact, and that the moving party is entitled to judgment as a matter of law. CR 56(c).

The burden is on the moving party to show an absence of an issue of material fact. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). If the moving party submits adequate affidavits to meet its burden, the burden shifts to the nonmoving party to set forth specific facts to rebut the moving party's contentions and show that a genuine issue exists. *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986). The nonmoving party may not rely on speculation or argumentative assertions to defeat summary judgment. *Id.*

*Evidence of Any Disputed Issue of Material Fact.* An inverse condemnation claim is an action that seeks to recover the value of the property that the government appropriated without a formal exercise of its eminent domain powers. *Fitzpatrick v. Okanogan County*, 169 Wn.2d 598, 605, 238 P.3d 1129 (2010) (quoting *Dickgieser v. State*, 153 Wn.2d 530, 534-35, 105 P.3d 26 (2005)). According to the Washington Constitution, "No private property shall be taken or damaged for public or private use without just compensation having been first made." CONST. art. I, § 16. Thus, a party

alleging an inverse condemnation must establish (1) a taking or damaging (2) of private property (3) for public use (4) without just compensation being paid (5) by a governmental entity that has not instituted formal condemnation proceedings. *Fitzpatrick*, 169 Wn.2d at 605-06 (quoting *Dickgieser*, 153 Wn.2d at 535). Both intended and unintended consequences of a governmental action may constitute a taking. *See Lambier v. City of Kennewick*, 56 Wn. App. 275, 280-81, 783 P.2d 596 (1989).

To have a taking, the landowner must show some governmental activity was the direct or proximate cause of the landowner's loss. *Halverson v. Skagit County*, 139 Wn.2d 1, 12-13, 983 P.2d 643 (1999) (quoting *Phillips v. King County*, 136 Wn.2d 946, 966, 968 P.2d 871 (1998)).

Proximate cause contains the elements of cause in fact and legal causation. *Ventures Nw. Ltd. P'ship v. State*, 81 Wn. App. 353, 365, 914 P.2d 1180 (1996). To establish cause in fact in a summary judgment proceeding for inverse condemnation, "the plaintiff must present evidence that supports at least a reasonable inference that the damage alleged to constitute a taking would not have occurred but for the governmental conduct in issue." *Ventures Nw.*, 81 Wn. App. at 365 (citing *Gaines v. Pierce County*, 66 Wn. App. 715, 726, 834 P.2d 631 (1992)). The government needs active proprietary participation, meaning "participation without which the alleged taking or damaging

14

would not have occurred." *Halverson*, 139 Wn.2d at 13 (emphasis omitted). Summary judgment is not appropriate for such questions of fact, "'unless but one reasonable conclusion is possible.'" *Ventures Nw.*, 81 Wn. App. at 365 (quoting *Hartley v. State*, 103 Wn.2d 768, 778, 698 P.2d 77 (1985)).

"Legal causation rests on policy considerations as to how far a party's responsibility for the consequences of its actions should extend." *Ventures Nw.*, 81 Wn. App. at 365 (citing *Taggart v. State*, 118 Wn.2d 195, 226, 822 P.2d 243 (1992)). "'[D]etermination of legal liability will be dependent on "mixed considerations of logic, common sense, justice, policy, and precedent."'" *Ventures Nw.*, 81 Wn. App. at 365 (quoting *Hartley*, 103 Wn.2d at 779). "A governmental entity does not become a surety for every governmental enterprise involving an element of risk." *Phillips*, 136 Wn.2d at 965 (citing *Bodin v. City of Stanwood*, 130 Wn.2d 726, 740, 927 P.2d 240 (1996)).

A claim for inverse condemnation exists where the alleged damage or taking was caused by a governmental entity's affirmative act of constructing a public project to achieve a public purpose. *Phillips*, 136 Wn.2d at 962 (quoting *Pepper v. J.J. Welcome Constr. Co.,*, 73 Wn. App. 523, 530, 871 P.2d 601 (1994)).

A claim for inverse condemnation also exists if the alleged damage or taking of the property is reasonably necessary for the maintenance and operation of other property

devoted to public use. *Boitano v. Snohomish County*, 11 Wn.2d 664, 668, 120 P.2d 490 (1941).

In *Lambier*, the Lambiers brought an inverse condemnation claim against Kennewick, arguing that the city's construction of a roadway caused drivers to leave the roadway and damage the Lambiers' property. *Lambier*, 56 Wn. App. at 278-79. Conversely, the city contended that the claim could not be brought against the city because the unlawful acts of the third-party drivers caused the damage, not the city. *Id.* at 282. The court rejected the city's argument, finding that the Lambiers' complaint was predicated on the defects in design and construction of the roadway, making the Lambiers' claim against the city valid. *Id.* at 282-83.

JMR asserts that it presented sufficient evidence to create a disputed issue of fact as to whether SCBID's operation of the wasteway constituted a taking. JMR maintains that SCBID's operation of the wasteway was the governmental activity that caused the damage because without operation by SCBID, no water gets to the wasteway, and no seepage occurs. Thus, given SCBID's stipulation that the landslide was proximately caused by seepage from the wasteway that SCBID operated, the elements of inverse condemnation are met. Or, at the very least, a disputed issue of fact remains.

The determinative issue is whether SCBID's act of operating the wasteway caused

the seepage. We conclude that the only reasonable conclusion from the evidence is that the design and construction of the wasteway was the proximate cause of the seepage, not SCBID's operation.

Just like in *Lambier*, JMR's claim is predicated on the design and construction of the wasteway. The evidence establishes that seepage was anticipated and is a natural consequence of the mere existence of the wasteway. For example, seepage and drainage was discussed in the repayment contract. Also, Mr. Montgomery testified that seepage occurs from the wasteway at a lesser amount than most irrigation district canals in Washington State. Furthermore, it is undisputed that seepage began as soon as USBR allowed water to enter the wasteway. JMR did not present evidence that seepage from the wasteway began or increased once SCBID took over operations. Thus, seepage is inherent in the design and construction of the wasteway and still occurs, regardless of who operates the wasteway. Therefore, USBR's design and construction of the wasteway caused the seepage and the resulting damage, not SCBID's operation of the wasteway. JMR's inverse condemnation claim fails.

Despite JMR's contention, simply assuming operation or maintenance of the wasteway does not impute liability on SCBID for any damages that may result from the wasteway. *Phillips* and *Halverson* are instructive on this point. In *Phillips*, our Supreme

Court held that a claim for inverse condemnation could not proceed against a county simply because the county approved a private developer's drainage system that caused damage to neighboring property. *Phillips*, 136 Wn.2d at 969. The court further held the county cannot "be liable for a design defect in a developer's drainage system simply because they accept the system after construction in order to provide proper maintenance in the future." *Id.* at 966. The court recognized that governmental conduct that is not a cause of damage to a plaintiff cannot constitute a taking in an inverse condemnation claim. *Id.* (citing *Gaines*, 66 Wn. App. at 726). The court concluded that the county could be liable if its failure to maintain the system caused the damage, but not if the only allegation related to the design of the system. *Id.* at 966-67.

In *Halverson*, levees constructed and owned by independent diking districts caused water to collect and flood the plaintiff's property. *Halverson*, 139 Wn.2d at 5-6. The plaintiffs brought an inverse condemnation action against Skagit County, claiming that the county acted in concert with the diking districts in the maintenance, improvement, and operation of the diking system. *Id.* at 6. The county argued that it could not be held liable for the levee-induced flooding because it did not build or own the dikes. *Id.* The Washington Supreme Court agreed with the county. *Id.* at 13. The court held that "[t]he County's repairs or improvements, even if in a concerted effort with the independent

18

diking districts, do not, as a matter of law, render them liable for the *mere existence* of those levees." *Id.* Furthermore, the court held that the plaintiff's theory that the county and the diking district were acting in concert did not meet the active, proprietary participation requirement needed before liability can attach in an inverse condemnation claim. *Id.*

As in *Phillips* and *Halverson*, SCBID cannot be held liable for damages caused by the design of the wasteway solely on the basis that it agreed to operate the wasteway. SCBID cannot be seen as an insurer of the wasteway simply because it operates a system that caused the damage.

Instead, to sustain a claim for inverse condemnation through operation, JMR needed to present evidence that inferred SCBID's operation of the wasteway caused the damage.[3]

*Boitano* is a good example of how a government's actions in operating a gravel pit supports a claim for inverse condemnation. In *Boitano*, the county uncovered an underground spring while operating a gravel pit. *Boitano*, 11 Wn.2d at 671. Needing to

---

[3] *Seal v. Naches-Selah Irrigation Dist.*, 51 Wn. App. 1, 10, 751 P.2d 873 (1988), determined that an inverse condemnation claim was not appropriate against an irrigation district for damage caused by seepage because the damage caused by the seepage was not contemplated at the time of construction. Since *Seal*, this court has determined that unintended results of governmental acts may also constitute a taking. *Lambier*, 56 Wn.

remove the water from the pit, the county constructed a channel to divert the excess water onto the plaintiff's property, causing lasting damages to the property. *Id.* The court held that inverse condemnation applied to the damages resulting from the operation of the gravel pit, where such operation included the necessary act of constructing the channel and conveying the water onto the plaintiff's land. *Id.* at 673.

*Boitano* is distinguishable from JMR's claim because the cause of the damage in *Boitano* clearly originates from the act of operation. The operation of the gravel pit caused a new source of water to accumulate and the county's construction of the channel, as a necessary part of its operation, caused the water to flow onto the plaintiff's property. *Id.* at 671. As compared to SCBID, the uncontested evidence establishes that seepage was already present when SCBID took over operation. Furthermore, there is no evidence that SCBID's operation increased the amount of seepage, or that SCBID's operation caused the seepage to perform in a manner different than anticipated by USBR. JMR failed to produce evidence that the seepage and landslide was a result of SCBID's operation of the wasteway. No disputed issue of material fact remains on whether SCBID's operation of the wasteway constituted a taking. The trial court did not err in granting summary judgment on this issue in favor of SCBID.

---

App. at 281.

20

In sum, JMR mistakes the governmental action that caused the landslide. JMR's inverse condemnation claim is predicated on the design and construction of the wasteway. SCBID cannot be liable for deficiencies in design and construction. Furthermore, because JMR produced no evidence of how SCBID's operation of the wasteway caused the taking, no disputed issue of material fact remains. The trial court appropriately granted summary judgment in favor of SCBID.

*Negligence.* To defeat summary judgment on a negligence claim, once the moving party has met its burden, the nonmoving party must show that a genuine issue of material fact exists with respect to any elements of duty, breach of duty, causation, and injury. *Kennedy v. Sea-Land Serv., Inc.*, 62 Wn. App. 839, 856, 816 P.2d 75 (1991). While the breach and proximate cause elements are generally fact questions and not subject to summary judgment, these questions can be decided as a matter of law if reasonable minds could not differ on the conclusion. *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999).

"[O]ne who impounds water is bound to exercise such reasonable care and caution in the construction, maintenance, and operation of his works as a reasonably careful and prudent person, acquainted with the conditions, would exercise under like circumstances." *Longmire v. Yelm Irrigation Dist*, 114 Wash. 619, 620, 195 P. 1014,

21

*aff'd*, 117 Wash. 702, 201 P. 788 (1921). "[The] owner of land lying below an irrigation ditch cannot recover for damages caused by seepage without showing that the ditch was negligently constructed or operated." *Id.* at 620-21.

An operator of an irrigation ditch is not an insurer. *Longmire*, 114 Wash. at 620. Accordingly, liability for damages caused by seepage cannot stand if there is no evidence of negligent construction or operation of the ditch. *Id.* at 622.

In 2009, the Washington legislature enacted RCW 89.12.050(2) to clarify the scope of liability imputed to irrigation districts managing transferred works as part of a federal reclamation project. *See* LAWS OF 2009, ch. 145, § 3. The statute states, "A district may enter into a contract with the United States for the transfer of operations and maintenance of the works of a federal reclamation project, but the contract does not impute to the district negligence for design or construction defects or deficiencies of the transferred works." RCW 89.12.050(2).

As a preliminary note, JMR contends that irrigation districts in Washington have a general duty to exercise reasonable care in the operation facilities so as to avoid causing damage to the property of others. JMR misstates the duty placed on SCBID. A correct recitation of the law is that SCBID had a duty to exercise reasonable care and caution in the maintenance and operation of the wasteway as a reasonably careful and prudent

22

person, acquainted with the conditions, *would exercise under like circumstances. See Longmire*, 114 Wash. at 620. Here, SCBID's relationship with USBR is an important circumstance to consider in determining if SCBID breached its duty.

JMR essentially argues that SCBID breached its duty to exercise reasonable care in operation when it failed to correct foreseeable problems associated with the design and construction of the wasteway. JMR maintains that SCBID knew that the land around the wasteway was unstable and that the drainage system was inadequate, and yet failed to address the problem even though it had the authority to do so.

We conclude that there is no disputed issue of material fact remaining as to SCBID's negligence. Reasonable minds cannot differ on the conclusion that SCBID exercised reasonable care and caution in the maintenance and operation of the wasteway as a reasonably careful and prudent person, acquainted with the conditions, would have exercised under like circumstances.

Undisputed testimony established that SCBID's operation methods and practices were reasonable and well within the standard of practice for irrigation systems. Mr. Montgomery stated that on all of his inspections, both before and after the 2006 landslide, he found the wasteway to be in good physical condition, well maintained, and performing as designed by USBR. Also, SCBID's failure to act was not negligent under the

23

circumstances because there is no inference that SCBID knew it should act or had the authority to act.

JMR did not meet its burden of creating a disputed issue of material fact that SCBID was negligent by failing to address the design and construction difficulties. First, the evidence relied on by JMR does not create an inference that landslides on JMR's orchard were a foreseeable result of SCBID's operation.[4] JMR contends that foreseeability can be inferred from SCBID's knowledge that landslides have occurred in the White Bluff's area in the past. However, SCBID's knowledge of past landslides does not infer that SCBID knew its continued operation would result in the 2006 landslide. In actuality, the evidence infers a different conclusion. Mr. Montgomery found that seepage was determined to be at an acceptable level in 1987, and that USBR never reported any deficiencies in the maintenance of the wasteway. This evidence infers that SCBID had no reason to foresee danger from its operation.

Also, JMR did not produce evidence to infer that SCBID considered the drainage system inadequate. The fact that the drainage system under Mr. Conrad's orchard was for agricultural purposes does not lead to an inference that the system was deficient. On the

---

[4] Contrary to JMR's contention, JMR did not stipulate on summary judgment that it knew the landslides would occur from the seepage, but stipulated only that seepage caused the landslide.

24

contrary, SCBID presented expert testimony that established that the system was draining appropriately. Mr. Montgomery observed that the drain outlets were discharging freely or were only partially submerged, indicating that the wasteway was not backing water into the adjacent drainage systems and, therefore, was not affecting subsurface drainage.

Even if SCBID knew of the problems with the area and the drainage system, the facts do not infer that SCBID's failure to take preventable measures was not unreasonable under the circumstances. The repayment contract establishes that SCBID did not have the authority to make any changes to the wasteway. While JMR presented sections of the repayment contract to establish that SCBID had some authority, this limited authority did not change the provision that only USBR could modify the wasteway or its drainage systems.

Ultimately, legal responsibility cannot be assigned to SCBID simply because it operated the wasteway as instructed. The damages arose from the design and construction of the wasteway. SCBID lacked the responsibility for determining whether additional drainage works were necessary and lacked the authority to construct the additional works. As stated in RCW 89.12.050(2), the repayment contract does not impute negligence to SCBID for design or construction defects or deficiencies of the

transferred works. SCBID is not an insurer for all damages that result from the wasteway.

The undisputed testimony established that the United States constructed the wasteway, and SCBID had an obligation to operate and maintain the wasteway according to the standards set by USBR. Evidence from Mr. Montgomery established that SCBID operated the wasteway according to USBR's standards. JMR did not present evidence to the contrary. There is no issue of material fact that SCBID breached the standard of care.

SCBID's operation of the wasteway was not negligent.

*Res Ipsa Loquitur.* As a general rule, a defendant's negligence is not presumed, but must be affirmatively proved. *Horner v. N. Pac. Beneficial Ass'n Hosps., Inc.*, 62 Wn.2d 351, 359, 382 P.2d 518 (1963) (quoting *Morner v. Union Pac. R.R. Co.*, 31 Wn.2d 282, 290-91, 196 P.2d 744 (1948)). However, "[t]he doctrine of res ipsa loquitur spares the plaintiff the requirement of proving specific acts of negligence in cases where a plaintiff asserts that he or she suffered injury, the cause of which cannot be fully explained, and the injury is of a type that would not ordinarily result if the defendant were not negligent." *Pacheco v. Ames*, 149 Wn.2d 431, 436, 69 P.3d 324 (2003). The incident causing the injury must be of such a nature that the occurrence itself is sufficient to

establish negligence on the part of the defendant without any further proof. *Horner*, 62 Wn.2d at 359 (quoting *Morner*, 31 Wn.2d at 290-91).

The doctrine allows negligence to be inferred "on the basis that the evidence of the cause of the injury is practically accessible to the defendant but inaccessible to the injured person." *Pacheco*, 149 Wn.2d at 436 (citing *Covey v. W. Tank Lines*, 36 Wn.2d 381, 390, 218 P.2d 322 (1950)).

To establish that the doctrine of res ipsa loquitur applies to a plaintiff's case, the evidence must show that "(1) the accident or occurrence producing the injury is of a kind which ordinarily does not happen in the absence of someone's negligence, (2) the injuries are caused by an agency or instrumentality within the exclusive control of the defendant, and (3) the injury-causing accident or occurrence is not due to any voluntary action or contribution on the part of the plaintiff." *Horner*, 62 Wn.2d at 359.

Three situations where negligence can be inferred without further proof are as follows: "(1) When the act causing the injury is so palpably negligent that it may be inferred as a matter of law, *i.e.*, leaving foreign objects, sponges, scissors, etc., in the body, or amputation of a wrong member; (2) when the general experience and observation of mankind teaches that the result would not be expected without negligence; and (3) when proof by experts in an esoteric field creates an inference that negligence

27

caused the injuries." *Id.* at 360.

The applicability of the doctrine of res ipsa loquitur involves a question of law. *Pacheco*, 149 Wn.2d at 436. If the doctrine is found to be applicable, the burden switches to the defendant to produce exculpatory evidence that rebuts or overcomes the presumption or inference of his or her negligence. *Horner*, 62 Wn.2d at 359 (quoting *Morner*, 31 Wn.2d at 291). If the defendant provides a completely exculpatory explanation for the cause of the injury in question, then res ipsa loquitur is not applicable. *Kemalyan v. Henderson*, 45 Wn.2d 693, 704-05, 227 P.2d 372 (1954).

JMR contends the trial court erred by dismissing the negligence claim on summary judgment because JMR established that the doctrine of res ipsa loquitur applies. JMR contends that case law and common sense dictates that irrigation districts do not damage the property of others without negligence, that SCBID had complete control over the wasteway, and that JMR did not contribute to the injury-causing landslide.

First, JMR fails to establish that the type of injury that occurred here is one that only happens due to negligence. Case law supports the conclusion that negligence is not involved in all landslides that are caused by seepage from an irrigation wasteway. As previously acknowledged in this opinion, the Washington Supreme Court has held that an irrigation district is not an insurer against all damages. *Longmire*, 114 Wash. at 620.

"[A]n owner of land lying below an irrigation ditch cannot recover for damages caused by seepage without showing that the ditch was negligently constructed or operated." *Id.* at 620-21. By requiring an injured party to show negligence, the holding in *Longmire* recognizes that injury can occur from seepage that is not a result of a district's negligence.

Second, JMR failed to show that SCBID had complete control over the seepage or the wasteway. While SCBID may have had some control over the operation of the wasteway, the repayment contract establishes that SCBID did not have the authority to construct projects to address the seepage. Instead, USBR determined the necessity of additional drainage projects and was responsible for construction. SCBID did not have exclusive control over the wasteway.

Last, the doctrine of res ipsa loquitur is not appropriate here because this is not a case where the evidence of the cause of the injury is inaccessible to the injured person. The wasteway is still intact. JMR has the ability to inspect the wasteway and SCBID's operating procedures to determine if SCBID was negligent in allowing seepage out of the wasteway.

Admittedly, in *Clark v. Icicle Irrigation District*, 72 Wn.2d 201, 204, 432 P.2d 541 (1967), the Supreme Court held that a jury instruction on the doctrine of res ipsa loquitur seemed particularly appropriate for cases involving breaks in irrigation ditches. However,

the holding in *Clark* does not affect our decision in the case because the facts differ. *Clark* involved a situation where the cause of the break could not be determined because the evidence had been destroyed. In contrast, this situation involves continuous and natural seepage from an irrigation ditch where the ditch remains and could be inspected for negligent design, construction, operation, or maintenance.

Res ipsa loquitur is a disfavored doctrine. It is used sparingly and in exceptional cases where the facts and demands of justice make its application essential. This is not an exceptional case. The damages are not novel or rare, nor do the facts demand application of the doctrine.

As a matter of law, the doctrine of res ipsa loquitur does not apply.

*Trespass.* JMR next asserts that the trial court erroneously dismissed JMR's claim for trespass. Trespass occurs when a person intentionally or negligently intrudes onto or into the property of another. *Borden v. City of Olympia*, 113 Wn. App. 359, 373, 53 P.3d 1020 (2002) (quoting *Mielke v. Yellowstone Pipeline Co.*, 73 Wn. App. 621, 624, 870 P.2d 1005 (1994)).

The elements for a claim of intentional trespass are: "(1) an invasion affecting an interest in the exclusive possession of property; (2) an intentional doing of the act which results in the invasion; (3) reasonable foreseeability that the act done could result in an

invasion of plaintiff's possessory interest; and (4) substantial damages to the res." *Seal v. Naches-Selah Irrigation Dist.*, 51 Wn. App. 1, 5, 751 P.2d 873 (1988) (citing *Bradley v. Am. Smelting & Refining Co.*, 104 Wn.2d 677, 691, 709 P.2d 782 (1985)).

The element of intent requires proof that the actor "'desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it.'" *Seal*, 51 Wn. App. at 5 (quoting *Bradley*, 104 Wn.2d at 682). At a minimum, this requires proof that the actor has knowledge that the consequences are certain, or substantially certain, to result from his conduct and proceeds in spite of this knowledge. *Seal*, 51 Wn. App. at 5 (quoting *Bradley*, 104 Wn.2d at 682).

In *Seal*, this court rejected the plaintiff's claim for trespass, stating that Washington courts "have adopted a rule of negligence with regard to damage resulting from the maintenance, construction or operation of irrigation works." *Seal*, 51 Wn. App. at 6. "'[I]t is the prevailing view that the proprietor of an irrigation conduit is not an insurer against damage which may result from its operation, but is liable only in case he has been negligent in the construction, maintenance, or operation of his irrigation works.'" *Seal*, 51 Wn. App. at 6 (alteration in original) (quoting *Holland*, 75 Wn.2d at 305).

31

Here, only elements two and three are disputed. To establish the intentional act element and the foreseeability element, JMR relies on evidence showing that in the 1970s and 1980s, SCBID knew the landslide problem in the White Bluffs area was created by ongoing development and operation of the irrigation facility and the lack of sufficient drainage. JMR claims that this fact is enough to create a disputed issue of material fact regarding whether SCBID knew landslides were certain or substantially certain to occur by its operation. JMR also contends that the failure to take measures to control the seepage is enough to create an issue of material fact as to whether SCBID knew the landslides were substantially certain to occur.

We conclude that the trial court did not err in dismissing JMR's claim of trespass. A claim of trespass is not warranted against SCBID because, as stated in *Seal*, recovery against an operator of an irrigation works requires a showing of negligence.

Furthermore, we conclude that no question of material fact exists as to whether SCBID intended to trespass on JMR's property. Despite JMR's contention, prior knowledge of the landslides is not enough to raise a question of material fact as to whether SCBID acted intentionally to cause the landslide, or that it believed that the landslide was substantially certain, as a result of the operation. While the evidence shows that landslides occurred in the area once water was introduced, there is no evidence that

32

SCBID knew that its operation would place enough water in the ground to cause such a slide. On the contrary, SCBID presented evidence that the wasteway it operated discharged less seepage than other irrigation channels in the area, and that it met the operation standards required by USBR.

JMR's argument that SCBID knew that a landslide was a substantially certain consequence of its failure to take preventive measures is essentially a claim that SCBID failed to act. Failure to act is affiliated with a negligence claim and does not support the intentional act needed for trespass. *See Price v. City of Seattle*, 106 Wn. App. 647, 660, 24 P.3d 1098 (2001). The trial court properly dismissed JMR's trespass claim.

*Conclusion.* We affirm the order granting summary judgment to SCBID.

_____
Kulik, J.

WE CONCUR:

_____    _____
Brown, J.                                            Siddoway, A.C.J.